**WILLAMETTE SAVINGS & LOAN, A DIVISION OF AMERICAN SAVINGS & LOAN, a Utah corporation, Plaintiff,**

v.

**BLAKE & NEAL FINANCE CO., an Oregon corporation, Norman Glenn, an individual and John Does 1 through 3, inclusive, Defendants.**

Civ. No. 82–1507–PA.

United States District Court,
D. Oregon.

Jan. 6, 1984.

---

Frank V. Langfitt, III, Janice R. Wilson, Lindsay, Hart, Neil & Weigler, Portland, Or., for plaintiff.

Donald McEwen, Janice M. Stewart, McEwen, Hanna, Gisvold, Rankin & Van-Koten, Portland, Or., for defendant Blake & Neal Finance Co.

Norman Sepenuk, James L. Collins, Portland, Or., for defendant Norman Glenn.

OPINION

PANNER, District Judge.

Plaintiff Willamette Savings & Loan ("Willamette") brings this action against Blake & Neal Finance Co. ("Blake & Neal"), its president, Norman Glenn ("Glenn"), and three John Does. Plaintiff alleges defendants violated the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, in a series of transactions involving the financing of retail purchases of mobile homes ("federal claims"). Plaintiff seeks a declaratory judgment as well as damages and attorney's fees. Additionally, plaintiff asserts claims for violation of Oregon securities law and the "State RICO," breaches of contract and of fiduciary duty, common law fraud, piercing the corporate veil, and accounting ("state claims").

On May 10, 1983, I granted defendants' motion to dismiss for failure to allege fraud with the specificity required by Fed. R.Civ.P. 9(b). Plaintiff then filed an amended complaint. Subsequently, defendants renewed their motions to dismiss. Later, I provided the parties with citations to many recent RICO cases and requested supplemental briefs. I now GRANT the motions to dismiss the federal claims and DISMISS the state claims for lack of diversity.

STANDARD

■ An action should be dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957). I therefore construe the complaint in the light most favorable to plaintiff. *See Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir.1980).

BACKGROUND

Plaintiff is a division of American Savings & Loan Association, a Utah corpora-

tion, which is authorized to transact savings and loan business in Oregon. Plaintiff is the successor in interest to Fred Meyer Savings & Loan Association and all references to "plaintiff" or "Willamette" include that association where appropriate.

Defendant is an Oregon corporation involved, among other things, in the financing of retail purchases of mobile homes ("units") in Oregon and Washington. Since 1980, Glenn has been president of Blake & Neal.

On July 1, 1977, plaintiff and Blake & Neal entered into a purchase agreement ("Agreement") in which plaintiff agreed to purchase certain retail installment contracts ("contracts") each month. These contracts were between an individual consumer ("borrower") and a mobile home dealer ("dealer") and assigned to Blake & Neal. (Appendix B to the amended complaint is an example.) On September 1, 1978, the Agreement was amended to identify plaintiff's underwriting requirements for purchase of contracts. During a five-year period, plaintiff purchased contracts from Blake & Neal for over $3 million.

Under the Agreement, plaintiff agreed to purchase from Blake & Neal "such retail installment contracts as shall be tendered" by Blake & Neal. (Agreement, ¶ 1, amended complaint, exhibit A.) The Agreement was effective for one year with automatic renewal for an additional year. (*Id.*, ¶ 2.) Plaintiff agreed that each month it would purchase contracts for an aggregate price of not less than $50,000 nor more than $1,000,000. (*Id.*, ¶ 3.) Plaintiff retained a right to refuse any contracts which it considered as not meeting its underwriting requirements. (*Id.*, ¶ 3a.) Plaintiff would initially pay Blake & Neal ten percent less than the contracts' face values but this rate would vary with the interest rate plaintiff paid to its depositors. (*Id.*, ¶ 4.)

Blake & Neal warranted to plaintiff that each contract was genuine and free from all defenses; title to each mobile home was vested in the consumer/borrower; the contract arose from a bona fide sale; and no payments had been made on the contract

**1418**

except where Blake & Neal had been notified in writing. (*Id.*, ¶ 5.) There were certain other warranties as well. (*Id.*) On breach of any warranty, Blake & Neal agreed to repurchase, upon written demand by plaintiff, any contract. (*Id.*, ¶ 6.)

For each contract, Blake & Neal agreed to tender to plaintiff the credit application of the borrower and a credit report on the borrower; an insurance policy providing fire, theft and other insurance; an assignment of the contract from Blake & Neal to plaintiff; and evidence of an application for a certificate of title on the property showing plaintiff as first security interest holder. (*Id.*, ¶ 7.) Under certain conditions, Blake & Neal would obtain substitute insurance. (*Id.*, ¶ 8.)

If default in the payment of any installment of a contract purchased by the plaintiff from Blake & Neal should continue for 45 days, plaintiff could notify Blake & Neal promptly of the default and within 45 days thereafter, unless the default was cured by the borrower, Blake & Neal was required to repurchase the contract. (*Id.*, ¶ 9.)

Plaintiff established a reserve account to secure performance of Blake & Neal's obligations (*id.*, ¶ 11) and paid Blake & Neal each month Blake & Neal's "earned portion of the finance charge on each of the retail installment contracts so purchased ... [including] the portion to be allocated by [Blake & Neal] to the particular dealer's reserve account." (*Id.*, ¶ 12.) The earned finance charge was to be computed by applying a contract's annual interest rate to the actual principal balances outstanding, for the time actually outstanding. (Amended complaint, appendix B, p. 1.)

For present purposes, I accept the following allegations in the amended complaint as true. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

From 1977 to 1980, Blake & Neal provided plaintiff false financial and credit status information on borrowers. (Amended complaint, ¶ 10A.)

From 1980 to 1983, Blake & Neal, Glenn and John Does 1 and 2:

(1) Received payments from contract obligors ["borrowers"] and diverted the funds to their own use, rather than pay the funds to plaintiff;

(2) Received payments from dealers who have repossessed mobile homes subject to the contracts and converted the same to their own use and failed to pass the payments onto [sic] plaintiff;

(3) Made payments on delinquent accounts and represented that such payments were made by the contract obligors in order to avoid defendant Blake & Neal's obligation to buy back delinquent retail installment contracts;

(4) Developed and/or approved transfers of units and assignment of obligations under the retail installment contracts to nonexistent purchasers/assignees or "straw men;"

(5) Administered and dealt with the retail installment contracts in a manner designed to divert funds due plaintiff to defendants, in particular at the direction of defendant Glenn in the fall of 1981;

(6) Provided false and fraudulent reports to plaintiff regarding the status of accounts, contracts, and mobile homes;

(7) Permitted sales of mobile homes subject to retail installment contracts without paying funds derived therefrom to plaintiff;

(8) Participated in the repossession of mobile homes sold under the retail installment contracts and then resold said mobile homes through the use of power of attorney forms executed by original purchasers at the time of purchase rather than statutory forms of affidavits of repossession in order to mislead plaintiff as to the true status of the contracts;

(9) Failed to properly manage the retail installment contracts and thereby permitted the loss and waste of the mobile homes designated as security for such contracts; and

(10) Failed to repurchase contracts which were more than 90 days in default after demand by plaintiff.

(*Id.*, ¶ 10B.)

Defendant Glenn has participated in the conduct described both directly and as a

person in control of Blake & Neal. (*Id.*, ¶ 10C.)

From 1980 to 1983, all defendants were involved in related transactions with Willamette and other financial institutions, including U.S. National Bank of Oregon, Far West Federal Savings & Loan Association, Queen City Savings and Loan Association, and:

(a) [Represented] to said financial institutions that Blake & Neal is selling chattel paper or financing chattel paper for transactions in which bona fide purchasers exist when in fact such bona fide purchasers did not exist;

(b) [Misrepresented] to U.S. National Bank of Oregon the collateral for said institution's loans to Blake & Neal by placing serial numbers on units which were not subject to the institution's security agreement in order to represent the unit as being subject to such security; defendant Glenn knew of such misrepresentation and participated in it;

(c) [Permitted] dealers to sell units and sell units out of trust without notifying the appropriate financial institutions so that said institutions would not be paid off;

(d) [Misrepresented] the status and number of delinquencies in chattel paper in order to avoid Blake & Neal's purchase and recourse obligations;

(e) [Failed] to notify financial institutions of repossessions in order that Blake & Neal would not have to repurchase chattel paper; and

(f) [Kept] duplicate files containing true data and false data in order to provide false information to said financial institutions and in actually providing such false information.

(*Id.*, ¶ 20.)

On February 4, 1983, Willamette wrote Blake & Neal to demand repurchase of all existing contracts. There were 336 contracts with a total principal balance of $2,777,771 as of January 31, 1983. (Amended complaint, appendix C.) The demand for repurchase was based on four categories of contracts or accounts:

| | |
|---|---|
| 1. Contracts in which Willamette Savings was given false credit information by Blake & Neal .. | $ 289,171.00 |
| 2. Contracts which Willamette has made demand on Blake & Neal to repurchase (90+ days past due) ..................... | 307,135.00 |
| 3. Other repossessions not 90 days past due (not included in 1 or 2 above) ................... | 142,210.00 |
| 4. Other accounts on which payments were made by Blake & Neal and apparently not by the customer (not included in 1, 2, or 3 above) .................... | 101,293.00 |
| TOTAL: | $ 839,809.00 |

(*Id.*) The letter stated that as these categories amount to a substantial portion of the total portfolio, and in light of evidence of "numerous misrepresentations," repurchase of the total portfolio was demanded. (*Id.*)

Blake & Neal has refused to repurchase either the total portfolio or those contracts which are 90 days or more in default, the principal balance of which, as of May, 1983, was over $400,000. (Amended complaint, ¶ 11.)

## DISCUSSION

If the allegations in the complaint are true, Willamette has been seriously defrauded. The question before me is whether such fraud constitutes a violation of either the federal securities laws or RICO.

### I. *Federal Securities Claim.*

The first question is whether the retail installment contracts, the 1977 Purchase Agreement and modifications, or the contracts and agreements together, constitute "securities" within the meaning of the Securities Act of 1933 or the Securities Exchange Act of 1934.

The Exchange Act defines a security broadly to encompass "any note ... or ... any investment contract ..." 15 U.S.C. § 78c(a)(10). The definition in the 1933 Act has been held to be virtually identical. *Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

██ Whether a particular financial transaction is a "security," however, depends more on the "economic realities" of the transaction than the letter of the statute. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). An important factor is whether the holder of the asserted "security" anticipates profits from the entrepreneurial efforts of others. *Id.*, at 852, 95 S.Ct. at 2060; *Securities and Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

The *Forman* and *Howey* tests are combined in the Ninth Circuit's "risk capital" test. *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1255–57 (9th Cir.1976). Here the ultimate inquiry is whether the holder contributed "risk capital" subject to the entrepreneurial or managerial efforts of others. *Id.* at 1257; *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1358 (9th Cir.1977). This test distinguishes between a security and a risky loan.[1]

As the *Kotz* court stated, risk inquiry is not simple. 532 F.2d at 1257. The court quoted the Seventh Circuit:

In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest. Also in a broad sense every investor lends his money to a borrower who uses it for a price and is expected to return it one day.

*Id.*, quoting *C.N.S. Enterprises, Inc. v. G. & G. Enterprises, Inc.*, 508 F.2d 1354, 1359, *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). Thus, it is not enough to simply declare that a "bank's business is lending money not trading in securities." *Kotz*, 532 F.2d at 1257, quoting with disapproval *McClure v. First Nat'l Bank of Lubbock*, 497 F.2d 490, 495 (5th Cir.1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). In fact, many banks and savings and loan associations do trade in securities. Thus, I must decide whether the instruments held

by Willamette are in economic reality "securities" received in exchange for Willamette's "investment" or instead simply a form of commercial financing.

██ The transaction boils down to the following. Borrower, an individual consumer, contracts with Dealer for the purchase of a mobile home including a loan to finance the purchase. The loan carries a fixed interest rate and payments are to be made monthly. Dealer assigns the retail installment contract to Lender (Blake & Neal). Borrower is then responsible to Lender for the monthly payments. Lender seeks to raise more current funds for its business than the aggregate monthly payments provide and sells packages of the contracts to Purchaser (Willamette). Purchaser buys the contracts from Lender at a discount from their aggregate face value. In the transaction, Lender obtains a benefit in the form of immediate payoff of the contracts. Purchaser obtains a benefit because income from Borrowers over the life of the contracts will total more than the price Purchaser paid Lender for the contracts.

Is this arrangement a "security," that is, the investment by Purchaser of funds subject to the entrepreneurial efforts of Lender (who remains responsible for managing the Borrowers' accounts)? Or is it rather a species of commercial financing, akin to a long-term loan where the Borrowers' total monthly payments on their contracts essentially amount to Lender's monthly payments for the loan?

The *Kotz* and *United California Bank* courts identified six "risk capital" factors which can be useful in deciding whether a transaction is an investment or a species of commercial financing. *Kotz*, 532 F.2d at 1257–58; *United California Bank*, 557 F.2d at 1358–59.

The first factor is *time*. Short-term notes are seldom securities. Long-term notes may not be securities if callable at the will of the obligee. *Kotz*, 532 F.2d at 1257–58. Here the time factor cuts both

---

**1.** This concept is thoroughly discussed in the section on "Risk Analysis and the Commercial-Investment Dichotomy" in the *Kotz* opinion, 532 F.2d at 1256–60.

ways. On the one hand, most of the contracts presumably provided for payment over at least several years. The example contract attached to the amended complaint provides for 144 monthly payments. (Amended complaint, appendix B.) On the other hand, the Agreement provided that Willamette could require Blake & Neal to repurchase any contract which was in default for over 90 days. (Agreement, ¶ 9.) Thus, Willamette was not at risk for more than 90 days on any contract, even though the contracts are long term.

The second factor is *collateralization.* For each contract sold, paragraph seven of the Agreement required Blake & Neal to tender to Willamette evidence of an application for title to the mobile home which listed Willamette as the first security interest holder. Thus, Willamette was secured. In addition, paragraph 11 of the Agreement provided for establishment of a reserve account to secure performance of Blake & Neal's repurchase obligations. A secured lender is generally less dependent on the managerial skills of a borrower. *Cf. Kotz,* 532 F.2d at 1258.

The third factor is *form of the obligation.* The parties referred to the objects of the sale both as retail installment contracts and as "chattel paper." While the name given by the parties is not controlling, they did not refer to "securities" at any point. However, neither did they refer to the Agreement as a "loan."

The fourth factor is the nature of the *circumstances of issuance.* This is important because "[w]hether the obligations were issued to a single party or a large class of investors sheds light on the nature of the financing." *Id.* at 1258 (citations omitted). Here the Agreement was a private one between two parties. There is no allegation that Blake & Neal was in the business of offering the sale of "chattel paper" to the public at large. Glenn argues that the transaction was analogous to a bank's selling participation rights in a loan to another financial institution. Courts have held such transactions do not involve securities. *See, e.g., Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426 (9th Cir.1978) (promisso-ry note given for construction loan to finance a shopping center); *American Fletcher Mortgage Co. v. U.S. Steel Credit Corp.,* 635 F.2d 1247 (7th Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981) (loan to development corporation for land acquisition and construction of residential condominiums); *United American Bank of Nashville v. Gunther,* 620 F.2d 1108 (5th Cir.1980) (loan for acquisition of controlling stock interest in a bank); *Robbins v. First American Bank of Virginia,* 514 F.Supp. 1183 (N.D. Ill.1981) (pension fund's purchase of a participation interest in a bank loan); *Provident National Bank v. Frankfort Trust Co.,* 468 F.Supp. 448 (E.D.Pa.1979) (loan to finance construction of 25 single-family town houses). Willamette contends that all of these cases are distinguishable.

The fifth factor is the *relationship between the amount borrowed and the size of the borrower's business.* The parties agree this factor is not significant.

The sixth factor is the *contemplated use of the proceeds.* In some situations a determination could be made whether the capital involved was an essential ingredient of enterprise formation (pointing to a security) or used to maintain current financial position (pointing to a loan). The parties agree this factor is not significant because the amounts paid to Willamette by the borrowers would have been paid to Blake & Neal instead.

Willamette contends the difficulty in evaluating the six "risk capital" factors indicates that the "risk capital" test is not the one which I should apply. Rather, Willamette urges use of the general *Forman* "economic reality" test. In *United States v. Carman,* 577 F.2d 556 (9th Cir. 1978), the Ninth Circuit itself declined to use "risk capital" analysis where the parties had not contended that the transaction at issue was actually a loan. *Id.* at 563 n. 9.

In *Carman,* West Coast Trade Schools ("Schools") derived a substantial portion of its income from the sale of packages of Federally Insured Student Loans ("FISL")

to various financial institutions. The FISL notes were sold to the institutions as part of a package including a contract for service of the paper, an agreement that Schools would repurchase any loans that went into default, and a further agreement that the Schools would buy back blocks of notes from the purchaser if given reasonable notice.

David Carman was the co-owner of Schools and was convicted, after a jury trial, of securities fraud. One of his grounds for appeal was that the transactions involved were not investment contracts and therefore not securities.

The Ninth Circuit noted that the "ultimate issue of whether or not a particular set of facts, as resolved by the factfinder, constitutes an investment contract is a question of law." *Id.* at 562 (citation omitted). *See also Kotz,* 532 F.2d at 1255. The court noted the Tenth Circuit has held that it was reversible error for a trial court to allow the jury to determine whether or not an investment contract existed in a civil case. *Ahrens v. American-Canadian Beaver Co.,* 428 F.2d 926 (10th Cir.1970). The *Carman* court held that the standard of review for a jury verdict in a criminal context, however, was sufficiency of the evidence. 577 F.2d at 562–63. "This approach recognizes the question of law involved and the necessity for accurate instructions on that law, while treating the jury's verdict with appropriate deference." *Id.* at 563.

Given that standard of review, the court concluded the jury verdict, which necessarily embodied a finding that the transactions involved securities, would stand. The court began its analysis by noting that "[a]n investment contract is a scheme involving an 'investment of money in a common enterprise with profits to come solely from the efforts of others.'" *Id.* at 563, quoting *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. The court continued:

> Carman ... argues that the profits expected by investors were in no way dependent upon the efforts of West Coast Schools because the return was in the form of fixed interest, guaranteed by the federal government.
>
> This argument ignores not only the service contract, which placed investors in a totally passive role with respect to collecting on the notes, but also two potential risks to investors: (1) the federal guarantee was conditioned on West Coast Schools' "care and diligence" in making and collecting on the notes; and (2) the reduction on notes of students who dropped out of school resulted in a direct refund liability on the part of West Coast Schools. Avoidance of loss on either ground was clearly dependent upon the sound management and continued solvency of West Coast Schools. This risk of *loss* is sufficient to bring the transaction within the meaning of a security, even where the anticipated financial gain is fixed. *See El Khadem v. Equity Securities Corp.,* 494 F.2d 1224, 1229 (9th Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

577 F.2d at 563. In concluding, the court stated:

> Where an integrated investment package satisfies the test set forth in *Howey, supra,* and places inadequately informed investors in a position of potential jeopardy, invocation of the protection and penalties of the Securities Act is justified.

*Id.* at 564.

There are several important distinctions between the transactions in *Carman* and those here. First, here defendants contend that plaintiff's allegations point to an ordinary commercial financing transaction. (Memorandum in Support of Defendant Blake & Neal Finance Co.'s Motions to Dismiss, p. 4.) There was no such contention in *Carman* and thus the court had no reason to evaluate the *Kotz-UCB* "risk capital" test. *Carman,* 577 F.2d at 563 n. 9. At a minimum, then, I am required to engage in a more searching analysis than did the *Carman* court.

Second, although the packages in *Carman* were sold to financial institutions, it is clear that those investors had access to much less information than Willamette had

here. As Judge Wright noted in his concurring opinion in *Kotz:*

> While banks are subjected to the risks of misinformation, their ability to verify representations and take supervisory and corrective actions places them in a significantly different posture than the investors sought to be protected through the securities acts.
>
> In an investment situation, the issuer has superior access to and control of information material to the investment decision. Rather than relying solely on semi-anonymous and secondhand market information, as do most investors, the commercial bank deals "face-to-face" with the promissor. The bank has a superior bargaining position and can compel wide-ranging disclosures and verification of issues material to its decision on the loan application.

*Kotz,* 532 F.2d at 1261–62.

Similarly here, Blake & Neal tendered to plaintiff the credit application of each borrower and a credit report on the borrower, insurance policies, and evidence of an application for a certificate of title on the property showing plaintiff as first security interest holder. (Agreement, ¶ 7.) In addition, plaintiff retained the right to refuse any retail underwriting requirements. (*Id.,* ¶ 3a.) Finally, plaintiff could require Blake & Neal to repurchase any contracts on breach of any warranty (*id.,* ¶ 6) or if default exceeded 90 days. (*Id.,* ¶ 9.) While the securities laws protect sophisticated as well as unsophisticated investors, the relationship between the parties is a factor to consider in analyzing the "commercial-investment dichotomy." *Kotz,* 532 F.2d at 1258.

Third, and most important, the *Carman* court itself emphasized the "risk of *loss*" to the investor. *Carman,* 577 F.2d at 563 (emphasis in original). In the FISL transactions there were two substantial sources of risk not present here. The federal government's guaranty of the loans was contingent on Schools' "care and diligence" in managing the loans. *Id.* In place of the governmental guaranty in *Carman,* the investor here is collateralized with a first security interest on the mobile homes. The

existence of that collateral is not subject to Blake & Neal's managerial abilities, as was the continued existence of the federal guaranty in *Carman.* Also, Schools was responsible for refunding to purchasers of the notes the unused principal balance of the loans of students who dropped out of school. Schools was in a precarious financial condition because many students had dropped out. "Because the notes had been sold at full face value, West Coast Schools was obligated to refund the difference .... West Coast Schools' refund liability was in excess of $500,000." *Id.* at 560. In the present case, by contrast, the only risk of loss is that of nonpayment by the individual borrowers of mobile home loans. That risk is dramatically reduced by the repurchase and reserve account provisions of the Agreement, as well as the collateral.

I have evaluated the Agreement, a sample retail installment contract, and a letter from Willamette. Those submissions were all attached to the complaint and thus part of it. *See* Fed.R.Civ.P. 10(c); *Amfac Mortgage Corp.,* 583 F.2d at 429–30; *Schnell v. City of Chicago,* 407 F.2d 1084, 1085 (7th Cir.1969). *Cf. Kotz,* 532 F.2d at 1254. In light of the significant differences between this case and *Carman,* I cannot conclude plaintiff can state any set of facts establishing the existence of a security.

Defendants' motions to dismiss the first claim are GRANTED.

## II. *RICO Claim.*

The second question is whether plaintiff has stated a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

Plaintiff incorporates by reference the allegations in its complaint made to support securities fraud. It then alleges:

> ¶ 19. The above-described conduct constitutes and results in the receipt of income by defendants derived, directly or indirectly, from a pattern of racketeering activity ....
>
> ¶ 20. From 1980 to 1983, defendants ... have received income derived, directly or indirectly, from a pattern of racket-

eering activity involving the above-described conduct and the following loans, chattel paper, and contracts with other financial institutions, including U.S. National Bank of Oregon, Far West Federal Savings & Loan Association, Queen City Savings and Loan Association, and others, in one or more of the following particulars:

(a) In representing to said financial institutions that Blake & Neal is selling chattel paper or financing chattel paper for transactions in which bona fide purchasers did not exist;

(b) In misrepresenting to U.S. National Bank of Oregon the collateral for said institution's loans to Blake & Neal by placing serial numbers on units which were not subject to the institution's security agreement in order to represent the unit as being subject to such security; defendant Glenn knew of such misrepresentation and participated in it;

(c) In permitting dealers to sell units and sell units out of trust without notifying the appropriate financial institutions so that said institutions would not be paid off;

(d) In misrepresenting the status and number of delinquencies in chattel paper in order to avoid Blake & Neal's purchase and recourse obligations;

(e) In failing to notify financial institutions of repossessions in order that Blake & Neal would not have to repurchase chattel paper; and

(f) In keeping duplicate files containing true data and false data in order to provide false information to said financial institutions and in actually providing such false information.

¶ 21. The above-described conduct constitutes a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961 which has occurred continuously between 1980 and 1983.

¶ 22. As a result of defendants' activities described above, plaintiff has been injured in its business and property ....

(Amended complaint.) Plaintiff also charges that defendants "used the mails, telephone, and interstate commerce to defraud plaintiff" (*id.*, ¶ 10) and that Glenn has:

(1) Diverted funds from defendant Blake & Neal to corporations in which Glenn has control and/or a significant ownership interest, including Circle Development Co., when Blake & Neal's cash flow was such that the money diverted necessarily involved money due to plaintiff under the purchase agreements and retail installment contracts;

(2) Diverted funds to Circle Development Co. by using such company to repossess and allegedly repair mobile homes subject to the retail installment contracts, fraudulently overcharging for such work and assessing such charges to plaintiff upon resale ....

(3) Diverted funds due to plaintiff to defendant Blake & Neal in order to enhance the control of Blake & Neal, pay financial obligations of Blake & Neal, provide funds to be used in Blake & Neal's other business pursuits such as mobile home parks, and use funds in enterprises which defendant Glenn controlled or owned.

(*Id.*, ¶ 10C.)

RICO prohibits several types of activity which Congress believed to be characteristic of organized crime: (a) using income derived from a pattern of racketeering activity to acquire an interest in an enterprise, (b) acquiring an interest in an enterprise by means of a pattern of racketeering activity, (c) conducting the affairs of a business through a pattern of racketeering activity, and (d) conspiring to commit any of the above. 18 U.S.C. § 1962. The statute defines "racketeering activity" as any one of a number of enumerated state and federal offenses ("predicate" offenses). 18 U.S.C. § 1961(1). Any two acts of racketeering activity are considered to be a pattern of racketeering activity as long as the second occurred within ten years of the first. 18 U.S.C. § 1961(5). Any person injured in his business or property by reason of a violation of section 1962 may re-

cover treble damages and attorney's fees. 18 U.S.C. § 1964(c).

Defendants argue that plaintiff has failed to state a claim in that it has failed to allege: (1) defendants have a connection with organized crime; (2) Blake & Neal invested in an "enterprise"; and (3) plaintiff has suffered a "racketeering enterprise injury." I address these contentions in turn.

## A. *"Organized Crime" Nexus.*

■ To combat increasing infiltration by organized crime of legitimate businesses, Congress enacted Title IX (RICO) of the Organized Crime Control Act of 1970, Pub.L. No. 91–452. It was enacted "to seek the eradication of organized crime in the United States by ... providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." 84 Stat. 922, 923 (1970).

A number of district courts have construed the statute to require plaintiff to allege defendant has a connection with organized crime. *See, e.g., Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 113 (S.D.N.Y.1975); *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347, 1359–61 (S.D.N.Y.), *aff'd,* 719 F.2d 5 (2nd Cir.1983); *Noonan v. Granville-Smith,* 537 F.Supp. 23, 29 (S.D.N.Y.1981); *Minpeco, S.A. v. Conticommodity Services, Inc.,* 558 F.Supp. 1348, 1349–51 (S.D.N.Y.1983); *Adair v. Hunt In-*

*ternational Resources Corp.,* 526 F.Supp. 736, 746–47 (N.D.Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 259–60 (E.D.La. 1981). However, the rationale of *Barr* has been rejected in its own district by *Bankers Trust Co. v. Feldesman,* 566 F.Supp. 1235, 1239–40 (S.D.N.Y.1983); *Gunther v. Dinger,* 547 F.Supp. 25, 27 (S.D.N.Y.1982); *Mauriber v. Shearson/American Express,* 546 F.Supp. 391, 395–96 (S.D.N.Y.1982); and *Hellenic Lines v. O'Hearn,* 523 F.Supp. 244, 247–48 (S.D.N.Y.1981). Moreover, while the Second Circuit affirmed the *Moss* decision on other grounds, the panel stated that RICO does not require allegation of any connection with organized crime. *Moss v. Morgan Stanley,* 719 F.2d 5, 21 (2nd Cir.1983). This rejection of *Barr* undercuts the precedential value of the other two cases from the Southern District of New York, *Noonan* and *Minpeco.* In addition, *Adair* has been effectively overruled by *Schacht v. Brown,* 711 F.2d 1343, 1353–56 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 509, 78 L.Ed.2d 698 (U.S. 1983). *Schacht* referred to the premise that liability under RICO depends on a connection with organized crime as "already discredited." *Id.* Indeed, the great weight of authority is that no connection with organized crime need be alleged.[2]

Based on an examination of the legislative history, courts have assigned to Congress several reasons for not including an

**2.** In the criminal context, the pertinent case is *United States v. Campanale,* 518 F.2d 352, 363 (9th Cir.1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). *See also United States v. Thordarson,* 646 F.2d 1323, 1328 n. 10 (9th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981). In the civil context, the cases include *Cenco v. Seidman & Seidman,* 686 F.2d 449, 457 (7th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Bennett v. Berg,* 685 F.2d 1053, 1063–64 (8th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *In Re Action Industries Tender Offer,* 572 F.Supp. 846, 850–51 (E.D.Va.1983); *In Re Longhorn Securities Litigation,* 573 F.Supp. 278 (W.D.Okl.1983); *Durante Bros. and Sons, Inc. v. Flushing Nat'l Bank,* 571 F.Supp. 489, 495 (E.D.N.Y.1983); *Austin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 570 F.Supp. 667, 669–70 (W.D.Mich.1983); *Ralston*

*v. Capper,* 569 F.Supp. 1575, 1578–79 (E.D.Mich. 1983); *Kimmel v. Peterson,* 565 F.Supp. 476, 490–93 (E.D.Pa.1983); *Windsor Associates, Inc. v. Greenfeld,* 564 F.Supp. 273, 277–78 (D.Md. 1983); *Hunt Int'l Resources Corp. v. Binstein,* 559 F.Supp. 601, 602–03 (N.D.Tex.1982); *Lode v. Leonardo,* 557 F.Supp. 675, 680–81 (N.D.Ill. 1982); *Crocker National Bank v. Rockwell Int'l Corp.,* 555 F.Supp. 47, 49 (N.D.Cal.1982); *D'Iorio v. Adonizio,* 554 F.Supp. 222, 230–31 (M.D.Pa. 1982); *Meineke Discount Muffler Shops, Inc. v. Noto,* 548 F.Supp. 352, 354 (E.D.N.Y.1982); *Harper v. New Japan Securities Int'l, Inc.,* 545 F.Supp. 1002, 1006 n. 7 (C.D.Cal.1982); *Engl v. Berg,* 511 F.Supp. 1146, 1155 (E.D.Pa.1981); *Parnes v. Heinold Commodities, Inc.,* 487 F.Supp. 645, 646 (N.D.Ill.1980); *Heinold Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 313 (N.D.Ill.1979).

explicit reference to "organized crime" in the statute. First, "organized crime" is incapable of precise definition, or even identification.

> Organized crime presumably takes many clandestine forms. A plaintiff should not be forced to prove that a defendant is part of a "society of criminals" before he can seek relief. Such a rule might emasculate the civil remedies' effectiveness as a deterrent to racketeering activity.

*Mauriber,* 546 F.Supp. at 396. *See also Bennett v. Berg,* 685 F.2d 1053, 1063 (8th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

Second, Congress was concerned with potential constitutional problems. A statute restricted in its application to organized criminals could be vulnerable to due process attack on vagueness grounds. *See Windsor Associates, Inc. v. Greenfeld,* 564 F.Supp. 273, 277 (D.Md.1983). That limitation also might have been construed as placing impermissible restraints on the First Amendment right to free association. *Id.* Additionally, mandating a link with organized crime could create a status offense incapable of surviving constitutional scrutiny. *Bankers Trust,* 566 F.Supp. at 1240; *Ralston v. Capper,* 569 F.Supp. 1575, 1579 (E.D.Mich.1983).

Third, proving a case under the statute would be considerably more difficult if the prosecutor, or a plaintiff, had to establish that the defendant was affiliated with organized crime. *See Windsor Associates,* 564 F.Supp. at 277.[3]

Courts have another reason for not reading an organized crime requirement into RICO. Congress proscribed certain conduct by *"any* person ...." 18 U.S.C. § 1962 (emphasis added). There is no need to look beyond the plain, broad language of the Act. *See Austin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 570 F.Supp. 667, 670 (W.D.Mich.1983). "[B]y requiring a nexus with organized crime we would be attempting to further Congress's legislative intent by ignoring its legislative language." *D'Iorio v. Adonizio,* 554 F.Supp. 222, 230 (M.D.Pa.1982).

> The statute makes no exceptions for "legitimate" persons who commit technical violations of RICO in a commercial context. Such persons are no less amenable to a private lawsuit under section 1964(c) than an underworld figure who violates the statute. It is the violation of the statute which controls, not the status of the violator.

*Lode v. Leonardo,* 557 F.Supp. 675, 680 (N.D.Ill.1982).

As the legislative history of RICO makes clear, Congress intended the statute "to combat the growing influence of organized crime in the United States, with specific focus on organized crime's infiltration of legitimate businesses." *Bankers Trust,* 566 F.Supp. at 1239. However, Congress did not require an organized crime nexus. The motions to dismiss the RICO claim on the ground of no allegation of organized criminal activity must fail.

### B. *"Person"/"Enterprise" Distinction.*

■ The second issue is whether plaintiff states a claim against defendant Blake & Neal in the absence of an allegation that this defendant invested in an "enterprise." As to Blake & Neal, only the first prohibition of section 1962 appears applicable. Title 18 U.S.C. § 1962(a) prohibits a "person" from using income derived from a pattern of racketeering activity to acquire an interest in an "enterprise."

Plaintiff contends defendants' fraud "results in the receipt of income by defendants derived ... from a pattern of racketeering activity ...." (Amended complaint, ¶ 19. *See also id.,* ¶ 20.) Section 1962(a), however, additionally requires use of such income to acquire an interest in, establish or

---

3. RICO criminal prosecutions have been upheld against members of the Hell's Angels Motorcycle Club, an attorney charged with investing money derived from a client's drug dealing, a large Japanese corporation, state legislators, union leaders, oil companies, and state prosecuting attorneys' offices .... The Sixth Circuit has held that the office of the Governor of the State of Tennessee could be charged as a RICO "enterprise." *Ralston,* 569 F.Supp. at 1579 (citations omitted).

operate an enterprise engaged in or affecting interstate commerce. 18 U.S.C. § 1962(a).

Liberally construing its complaint, Willamette alleges that Glenn used the fraudulently obtained income in the operation of an enterprise, Circle Development Company. (Amended complaint, ¶ 10C(1).) Willamette also alleges that Glenn used the income to operate an enterprise, Blake & Neal. (*Id.*, ¶ 10C(3).) Willamette has not, however, alleged that *Blake & Neal* used the income to acquire an interest in, establish or operate an enterprise.

Plaintiff has met the pleading requirements of sections 1962(a) and (c) as to Glenn, but has not stated a claim against Blake & Neal. Even if plaintiff amended its complaint to allege that Blake & Neal used the income for its own operations, the claim would fail. The "person" of section 1962(a) is not the same as the "enterprise," and Blake & Neal cannot be both.

The statute defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). "Enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity ...." 18 U.S.C. § 1961(4).[1] To state a claim under RICO, plaintiff must allege the existence of two entities. Under section 1962(a), one entity, the "person," uses income derived from a pattern of racketeering activity to acquire an interest in the second entity, the "enterprise." 18 U.S.C. § 1962(a). *Cf. Bennett,* 685 F.2d at 1061 (section 1962(c) case).

At least four district court decisions have held that only a "person," and not the "enterprise," can be liable to a civil RICO plaintiff. *See Parnes v. Heinold Commodities,* 548 F.Supp. 20, 21–22 (N.D.Ill. 1982); *Fields v. National Republic Bank of Chicago,* 546 F.Supp. 123, 124–25 (N.D. Ill.1982); *Bays v. Hunter Savings Assoc.,* 539 F.Supp. 1020, 1023–24 (S.D.Ohio 1982); *Van Schaick v. Church of Scientology,* 535 F.Supp. 1125, 1135–36 (D.Mass.1982).

*Cf. Barker v. Underwriters at Lloyd's,* 564 F.Supp. 352, 357 (E.D.Mich.1983); *Landmark Savings & Loan v. Rhoades,* 527 F.Supp. 206, 208 (E.D.Mich.1981). At least two cases have held that the "enterprise" may be a defendant. *See United States v. Hartley,* 678 F.2d 961, 986–90 (11th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *D'Iorio,* 554 F.Supp. at 232–33. *Cf. Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 567 F.Supp. 1146, 1153–54 (D.N.J. 1983) (noting uncertainty but not reaching question).

Apparently, no case holds that a corporation may simultaneously be the "person" *and* the "enterprise."

> The language of § 1962 clearly contemplates the interaction of a person and an enterprise, both separately defined by the Act....
>
> We have not discovered one case ... where a wholly legitimate corporation has been found to have violated RICO absent proof that it was a person who participated in the affairs of an enterprise through a pattern of racketeering activity. In all cases the person defined by the Act is the defendant and is always distinct from the enterprise. It is clear that the element which raises the underlying criminal act to a RICO violation is the defendant's interaction with the enterprise.

*Bays,* 539 F.Supp. at 1023–24. *See also United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Van Schaick,* 535 F.Supp. at 1135–36; *In Re Action Industries Tender Offer,* 572 F.Supp. 846, 849 (E.D.Va.1983). *Cf. United States v. Benny,* 559 F.Supp. 264, 268 (N.D.Cal.1983). Accordingly, plaintiff's RICO claim against defendant Blake & Neal will be dismissed.

### C. *Racketeering Enterprise Injury.*

Defendant Glenn's final attack is that plaintiff has not alleged damage from a

---

**4.** At least three enterprises can be found to exist in this case. Blake & Neal would qualify as an enterprise, as would Glenn individually. The third possibility would be for Blake & Neal and Glenn jointly to be the "enterprise."

"racketeering enterprise injury." (Defendant Glenn's Memorandum in Support of Motion to Dismiss, pp. 15–18.)

Section 1964(c) limits recovery under RICO to a "person injured in his business or property *by reason of a violation of section 1962 ....*" 18 U.S.C. § 1964(c) (emphasis added). Sections 1962(a) and (c) require proof of a "pattern of racketeering activity." 18 U.S.C. § 1962(a), (c). To constitute a "pattern," "at least two acts of racketeering activity" must be proved. 18 U.S.C. § 1961(5). "Racketeering activity" includes securities fraud. 18 U.S.C. § 1961(1)(D).

> Without doubt,
>
> RICO does not just provide an extra, treble damages remedy for an injury that is already cognizable; rather, RICO provides a remedy to a person injured by a "pattern of racketeering activity" proscribed by Section 1962, which is separate and distinct from the constituent, predicate offenses comprising such a pattern.

*In Re Longhorn Securities Litigation,* 573 F.Supp. 255, 270 (W.D.Okl.1983). *See also Bankers Trust,* 566 F.Supp. at 1241 n. 8 (noting that section 1962 creates its own substantive offenses, violations of which carry harsher criminal penalties than do the predicate acts themselves) (citations omitted). The opposite question is whether RICO liability may fasten upon simple proof of the commission of two or more predicate offenses within ten years of each other, as the *Longhorn* court concluded, 573 F.Supp. at 268, or whether a plaintiff must prove "something more," *In Re Action Industries Tender Offer,* 572 F.Supp. at 850, namely, commission of a "racketeering enterprise injury."

Many courts have defined narrowly the type of injury compensable under RICO. These courts have limited standing to sue to plaintiffs alleging something more than two violations of the predicate crimes. *See, e.g., id.; Friedlander v. Nims,* 571 F.Supp. 1188, 1194 (N.D.Ga.1983); *Bankers Trust,* 566 F.Supp. at 1240–42; *Barker,* 564 F.Supp. at 358; *Gitterman v. Vitoulis,* 564 F.Supp. 46, 48–49 (S.D.N.Y.1982);

*Moss,* 553 F.Supp. at 1361, 1363–64; *Johnsen v. Rogers,* 551 F.Supp. 281, 284–86 (C.D.Cal.1982); *Meineke Discount Muffler Shops, Inc. v. Noto,* 548 F.Supp. 352, 354 (E.D.N.Y.1982); *North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207, 210–11 (N.D.Ill.1980); *Harper v. New Japan Securities Int'l, Inc.,* 545 F.Supp. 1002, 1004–08 (C.D.Cal.1982); *Landmark,* 527 F.Supp. at 208–09; *King v. Lasher,* 572 F.Supp. 1377, 1382 (S.D.N.Y.1983). *Cf. Austin,* 570 F.Supp. at 669; *Van Schaick,* 535 F.Supp. at 1137.

On the other hand, a number of courts have rejected arguments that "standing" or "causation" under RICO require something more than simple allegations of two violations. *See, e.g., Schacht,* 711 F.2d at 1356–58; *Ralston,* 569 F.Supp. at 1579–80; *Seville,* 567 F.Supp. at 1156–57; *Windsor Associates,* 564 F.Supp. at 278–79; *In Re Longhorn Securities Litigation,* 573 F.Supp. at 269. *Cf. Bennett,* 685 F.2d at 1058–59; *Hellenic Lines,* 523 F.Supp. at 248.

A few courts have interpreted section 1964(c) to require that the injury to business or property be an injury to competitive interests. *See, e.g., Bankers Trust,* 566 F.Supp. at 1241; *North Barrington,* 547 F.Supp. at 210. This approach has been criticized as inconsistent with RICO's purposes and rejected by many courts. *See, e.g., Schacht,* 711 F.2d at 1357; *Bennett,* 685 F.2d at 1059; *Kimmel v. Peterson,* 565 F.Supp. 476, 493–95 (E.D.Pa.1983); *Gitterman,* 564 F.Supp. at 48; *Van Schaick,* 535 F.Supp. at 1137 n. 11; *Landmark,* 527 F.Supp. at 208; *Hellenic Lines,* 523 F.Supp. at 248. *Cf. Barker,* 564 F.Supp. at 358 (implicitly rejecting competitive injury requirement). A number of these courts, however, have gone on to interpret section 1964(c) to require a "racketeering enterprise injury." *See Barker,* 564 F.Supp. at 358; *Gitterman,* 564 F.Supp. at 49; *Landmark,* 527 F.Supp. at 208. *Cf. Van Schaick,* 535 F.Supp. at 1137 (requiring "business loss from racketeering injuries").

The *Landmark* court's discussion is an excellent example of this approach:

The RICO statute provides that "any person injured in his business or property by reason of a violation of section 1962 . . . shall recover threefold the damages he sustains . . . including an attorney fee." 18 U.S.C. § 1964(c). This language is similar to the treble damage provision contained in Section 4 of the Clayton Act, 15 U.S.C. § 15. It is apparent that Congress has provided for treble damages in each Act as a means of effectuating the policy embodied in each Act.

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court discussed the type of injury required to maintain a civil antitrust action. The Court stated:

"We therefore hold that for plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' *Zenith Radio Corp. v. Hazeltime Research*, 395 U.S. [100] at 125 [89 S.Ct. 1562 at 1577, 23 L.Ed.2d 129.]"

*Id.* at 489, 97 S.Ct. at 697 . . . .

The Court does not conclude that the RICO statute should be construed to require a competitive injury as that term is defined in antitrust cases. What is required to bring a civil RICO damage action is an allegation that the plaintiff has suffered a "racketeering enterprise injury." Competitive injuries and racketeering enterprise injuries would frequently overlap, but they are not necessarily the same. A "racketeering enterprise injury" might occur, for example, if a civil RICO defendant's ability to harm the plaintiff is enhanced by the infusion of money from a pattern of racketeering activity into the enterprise . . . .

*Landmark*, 527 F.Supp. at 208–09. As cogently summarized recently, "in order to allege a civil cause of action under RICO, a plaintiff must have suffered the type of injury that RICO was designed to prevent." *In Re Action Industries Tender Offer*, 572 F.Supp. at 851. The *Action Industries* court more fully explained that

Congress intended to provide a treble damages remedy to those plaintiffs who could allege and prove an injury resulting from a pattern of racketeering and corruption—not simply from a predicate act for which the plaintiff could be fully compensated under a federal or state law. Section 1964(c) compensates plaintiffs suffering from a racketeering injury—not just from a predicate act in which there is no racketeering involvement.

*Id.* at 852.

In adopting the *Landmark* court's approach, the *Harper* court expanded on the legislative history underpinning the antitrust analogy:

The requirement that a plaintiff allege some injury "by reason of a violation of § 1962" is more than a direct transference of antitrust principles to the RICO context. Rather, it is an analogy supported by the fact that the language of § 1964(c) is nearly identical to § 4 of the Clayton Act. Congress, which originally envisioned RICO as an antitrust statute, was not unaware of this similarity; yet, it retained the language long after it had decided that the Organized Crime Control Act should be enacted as an independent statute. Thus, analogy to anti-trust law is the most logical point of departure in fashioning a well-reasoned construction of § 1964(c).

*Harper*, 545 F.Supp. at 1007.

The *Action Industries* court acknowledged that "[t]here is no set definition for the type of injury for which RICO provides a civil remedy." 572 F.Supp. at 851. Ne-

vertheless, Justice Stewart's well-known observation is apropos:

I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [*i.e.*, "hard-core pornography"]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

*Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

Courts recognize a racketeering enterprise injury when they see it. In the *Gitterman* case, for example, residential customers of a carpet company alleged the company operated as an organized criminal gang, conspiring to gain entry to customer's apartments to steal their jewelry. The court held that an allegation of a racketeering enterprise injury was necessary and was made. 564 F.Supp. at 49. *See also Austin*, 570 F.Supp. at 669, and *Meineke*, 548 F.Supp. at 354, which assumed that racketeering enterprise injury was required and held the requirement was met, and *Schacht*, 711 F.2d at 1358–59, which failed to decide whether such injury was required but held that any requirement was easily met.

■ I adopt the view that a valid RICO complaint must allege a racketeering enterprise injury, which is not necessarily a competitive injury. Plaintiff has not alleged Glenn engaged in the type of fraud RICO was designed to prevent. Accordingly, I dismiss the RICO claim against Glenn and the three John Does for plaintiff's failure to allege it suffered from a racketeering enterprise injury.[5]

---

**5.** Plaintiff has also failed, defendants argue, to allege they engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(a). The statute defines that phrase as at least two acts of "racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5). In turn, "racketeering activity" is defined to include, among others, mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and "fraud in the sale of securities ... punishable under any law of the United States." 18 U.S.C. § 1961(1)(D).

## CONCLUSION

Defendants' motions to dismiss the first and third claim are GRANTED. The tenth claim seeks a declaratory judgment under 28 U.S.C. § 2201. I DISMISS this claim for want of subject matter jurisdiction. I DISMISS the balance of the claims, which are all pendent state claims, for lack of diversity.

Plaintiff has twenty (20) days from the date of filing of this opinion to move to file a *second amended complaint.* Defendants will have ten (10) days to respond.

IT IS SO ORDERED.

I have already concluded that the investment packages were not "securities," *supra* section I. Plaintiff must therefore allege "mail fraud" or "wire fraud" if the complaint is to contain any "*valid* allegation of 'fraud,' to underpin the 'predicate acts' of 'racketeering' ...." *Moss*, 719 F.2d at 18–19 (emphasis in original; footnote omitted). Because I dismiss the RICO claim against Glenn for failure to allege a "racketeering enterprise injury," I need not decide whether plaintiff has adequately pled mail or wire fraud.