Robert E. AHERN, et al., Plaintiffs,

v.

Roy GAUSSOIN, et al., Defendants.

SILVER EAGLE COMPANY, et al., Plaintiffs,

v.

William SANDERS, et al., Defendants.

Ethel L. URBAN, Plaintiff,

v.

William SANDERS, et al., Defendants.

James V. MITCHELL, et al., Plaintiffs,

v.

William SANDERS, et al., Defendants.

Civ. Nos. 83–1167–RE, 83–1963–RE to 83–1965–RE.

United States District Court, D. Oregon.

May 10, 1985.

See also 104 F.R.D. 37.

Bruce M. Hall, John F. McGrory, Jr., Sarah J. Ryan, Bruce MacGregor Hall, P.C., Portland, Or., for plaintiffs.

Leslie M. Roberts, Sullivan, Joselson, Johnson & Kloos, Portland, Or., for Silver Eagle plaintiffs.

Marco J. Magnano, Jr., Foster, Pepper & Riviera, Seattle, Wash., Donald Winfree, Portland, Or., for defendant Directors.

Paul A. Renne, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal., Richard Bayless, Hampson, Bayless, Murphy & Stiner, Portland, Or., for defendant Accountants.

Wayne Hilliard, Craig D. Bachman, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or., for defendant Attorneys.

Frank H. Lagesen, Cosgrave, Kester, Crowe, Gidley & Lagesen, Portland, Or., for defendant Officers.

REDDEN, District Judge:

Plaintiffs in these actions are holders of 30 day variable rate demand notes issued by Tradex, Inc. (Tradex), an Oregon corporation. They seek relief based on numerous alleged violations of federal and state security laws, as well as on certain other statutory and common law claims. Plaintiffs move for partial summary judgment

---

1. Among those details are a number of name changes. I refer to all forms of the company as

in their favor. All defendants have filed cross motions for partial summary judgment.

*Background*

I. *Parties and Posture of the Litigation*

I am consolidating these four cases for all purposes (see pp. 69–70). In each case there are four separate groups of defendants: (1) former Tradex officers (defendant officers); (2) former Tradex directors (defendant directors); (3) Nicholas Fisher and Touche Ross & Co. (defendant accountants); and (4) Robert Simpson and Schwabe, Williamson, Wyatt, Moore & Roberts (defendant attorneys). The defendants are the same in each case, except that in Civil No. 83–1167 (*Ahern*), defendant officers include only David Fearn and Clyde Kaneshero. In Civil No. 83–1963, 1964 and 1965 (*Silver Eagle* cases), defendant officers include Fearn, Kaneshiro, Russell Brown, Jr. and Kenneth Delzer.

II. *Facts*

I find it unnecessary to recite all the details of Tradex's corporate history.[1] It is sufficient to begin by saying that Tradex was originally a non-profit corporation factoring the freight bills of its member freight carriers. Tradex operated, at least primarily, in the Pacific Northwest. Tradex thus provided a service to the carriers by buying their freight bills from them (at a discount); Tradex then collected on the bills itself.

Tradex financed its operations through a line of credit with a major bank, most recently Seattle-First National Bank (Sea-First). In the late 1960's and early 1970's Tradex began issuing notes to its members, members' employees and other persons connected with the trucking industry. Through this note program, Tradex obtained additional funds to finance its operations. Note purchasers received interest on their notes. These notes were not registered with the Securities and Exchange Commission (SEC).

---

"Tradex" except where I think it would be helpful not to do so.

In mid-1981, Tradex began a process of reorganization, which ultimately became effective June 1, 1982. Pursuant to the reorganization, Tradex became a for-profit corporation. Tradex's legal counsel, who are the present defendant attorneys, had concluded that the notes were "securities" under federal law. Thus, as part of Tradex's reorganization, the note program was registered with the SEC.

Defendant attorneys, Schwabe, Williamson, Wyatt, Moore & Roberts (Schwabe, Williamson) began preparation of an S–1 Registration Statement in the fall of 1981.[2] Tradex filed a preliminary prospectus in the form of an S–1 Registration Statement with the SEC on December 11, 1981. Tradex issued a final prospectus, amending the earlier one, on March 29, 1982.

On April 19, 1982, Tradex also filed an S–1 Registration Statement covering the separate issuance of $30 million in variable rate 30-day demand notes. This registration statement was amended by a prospectus with an effective date of June 1, 1982.

Accountant defendants Touche Ross & Co. (Touche Ross) audited Tradex's financial statement for the fiscal year ending August 31, 1982, and certified the accuracy of that statement in the March 29 and June 1 prospectuses. Touche Ross conducted post-audit reviews of the financial statement in connection with both prospectuses. It also assisted with preparation of certain unaudited interim financial statements dated February 28, 1982.[3]

On April 12, 1982, Tradex held its 1981 annual meeting, which apparently had been postponed due to delays connected with the reorganization. At the meeting, the proposed reorganization was presented to Tradex's members, who approved it.

Throughout the relevant time period, Tradex operated pursuant to a line of credit from SeaFirst. Plaintiffs' notes were subordinated to the SeaFirst loan. The limit on the line of credit from SeaFirst was originally $12 million, and was subsequently increased to $20 million. On January 26, 1983, SeaFirst declared Tradex to be in default of its loan agreement with SeaFirst. Plaintiffs' notes, which were subordinated to SeaFirst's lien on Tradex's receivables, were "frozen" by SeaFirst. Plaintiffs have been unable to redeem the notes.

Plaintiffs subsequently filed these actions. The *Ahern* plaintiffs assert claims under sections 11, 12, 15 and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, 77*o* and 77q(a), sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78t(a), and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, *et seq.* The *Ahern* plaintiffs also assert pendent claims for violations of Oregon securities statutes, the Oregon RICO statute, conversion, fraud, negligence, gross negligence and money had and received. The *Silver Eagle* plaintiffs assert claims for violations of sections 11, 12 and 17(a) of the Securities Act of 1933, section 10(b) of the Securities Exchange Act of 1934 and O.R.S. 59.115.

Plaintiffs' claims are based on their contentions that various Tradex documents, and certain statements made by defendants, contained fraudulent misrepresentations and omissions. Many of these particulars are better addressed in the discussion of plaintiffs' specific claims, but certain of them are central to plaintiffs' claims and to the background of these cases. These are: (1) Tradex's relationship with Animated Electronics, Inc. (Animated); (2) Tradex's relationship with IML Freight, Inc. (IML); and (3) an alleged check "kite" employed by Tradex.

### A. *Tradex's relationship with Animated*

On or about January 26, 1982, Tradex and Animated entered into an agreement pursuant to which Tradex agreed to factor Animated's accounts and contracts receivable. Animated was Tradex's first factoring customer from outside the transportation

---

**2.** Robert Simpson was the Schwabe, Williamson partner with overall client responsibility for Tradex.

**3.** Nicholas Fisher was the Touche Ross partner in charge of the Tradex account.

industry. Animated was a manufacturer and seller of novelty devices.[4]

Plaintiffs allege that prior to the agreement, Animated had suffered financial difficulties, and had difficulty obtaining financing. Its source of financing, the Walter Heller Company, had expressed concern with Animated's slow collection rate and had renewed its annual agreement with Animated on a restricted month-to-month basis. Walter Heller ultimately refused to continue financing Animated in January 1982.

Plaintiffs allege that the negotiations culminating in the Animated-Tradex agreement included discussions of Animated's financial and financing difficulties. Plaintiffs contend the high delinquency rate on Animated's invoice receivables was specifically discussed and considered.

The minutes from the January 26, 1982 meeting which approved the Animated factoring agreement show that the projected revenues from the agreement were anticipated to be $7 million in 1982. Animated's individual accounts were located in almost every state in the country, as well as Canada and Mexico.

Tradex began accepting receivables and machine purchase contracts from Animated. The contracts provided for monthly payments over a 24 to 36 month period, as opposed to the short term accounts receivable. Tradex continued factoring both accounts receivable and contracts during the spring and summer of 1982.

On July 27, 1982, Tradex President David Fearn advised the Tradex board that Animated's receivables amounted to $3.5 million. The minutes of that board meeting indicate Tradex's intention to "phase out" of factoring Animated accounts. The various defendants deny knowledge of Tradex's factoring of long term contracts but it did become a subject of concern to Tradex's directors in the fall of 1982. Fearn then reported that Tradex was working on a method for selling factored accounts back

to Animated. This problem had not been resolved when SeaFirst declared Tradex in default.

In its January 26, 1983 letter to Tradex, SeaFirst claimed Tradex had been improperly including long term contracts in its borrowing base (which the contract provided was 75% of eligible accounts receivable), and had therefore been exceeding the limits of the loan agreement. SeaFirst also declared that:

> We view your financing of Animated Electronics, Inc. and the existing deterioration of Animated Electronics, Inc.'s ability to meet its obligations to you as a matter not fairly disclosed to us, resulting in a violation of your representations and warranties contained in the Loan Agreement.

### B. *Tradex's Relationship with IML*

IML was Tradex's largest customer. On April 12, 1982, Tradex's Board of Directors gave permission to IML to collect its own freight bills, obviating factoring them through Tradex. Under this arrangement, Tradex collected directly from IML and had a security interest in their freight bills, but did not own them or have a right to collect directly from IML's customers should IML become bankrupt. The latter right was available when Tradex factored freight bills. IML did file for bankruptcy in April 1983.

Plaintiffs point out that Tradex had not previously financed, rather than factored, a customer's bill. They argue that by doing so here, Tradex greatly increased its risk. Plaintiffs contend that defendants knew or should have known of IML's poor financial condition at the time it agreed to finance its bills.

### C. *Check Kite*

Tradex's agreement with SeaFirst allowed Tradex to deposit its collections on purchased bills into its account at SeaFirst.

---

**4.** Animated allegedly manufactured and sold coin-operated machines containing either a mechanical chicken which clucked as it produced plastic eggs containing children's toys or a mechanical Fred Flintstone character who cried out "ya-ba-da-ba-doo" as he dispensed plastic eggs.

These deposits were immediately applied to reduce the balance of the loan line, making more loan funds available to purchase additional freight bills.

Tradex also maintained a disbursement bank account in a Missoula, Montana bank to process checks written in settlement of purchased freight bills. Checks written by Tradex on the Montana bank account usually required three business days for presentation for payment. When presented for payment Tradex covered them with funds wired from its SeaFirst account. SeaFirst then recorded these wire transfers as borrowings by Tradex against its operating loan. Because of the time lag, and because Tradex did not cover the checks until presented, there was a substantial "float" in Tradex's disbursement cycle.

Plaintiffs allege that at some point Tradex began issuing checks without any economic basis to allow manipulation of its line of credit and to avoid a default under its loan agreement with SeaFirst. The checks were drawn on the Montana bank, payable to an existing carrier customer, either solely or jointly with Tradex. Thus, the checks appeared to SeaFirst as payments of bills by Tradex (that is, payment to Tradex's customers for their accounts receivable), and reduced the amount of money applied by SeaFirst to its loan to Tradex. This gave Tradex more money to work with. Tradex endorsed the checks to itself and as the "attorney in fact" for the customer where one was named as a payee. The customer did not receive the checks. Plaintiffs contend that between June 1982, when the "kite" began, and January 26, 1983, Tradex wrote approximately 2,000 such checks for a total of over $300 million.

*Discussion*

## I. Standard

In considering the parties' motions for partial summary judgment, I view the evidence and the inferences drawn from that evidence in the light most favorable to the parties opposing the motions. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1280 (9th Cir.1982). A movant is entitled to summary judgment on a claim only where there are no genuine issues of material fact and the movant is entitled to prevail as a matter of law. *See id.*

In the *Silver Eagle* cross motions for partial summary judgment, the parties have heavily relied on the memoranda and exhibits submitted in *Ahern.* I therefore address the *Silver Eagle* cases only where necessary.

I note that the *Ahern* plaintiffs have moved to strike certain portions of defendants' reply memorandum, contending it addresses arguments raised by plaintiffs in support of their own motions. There is overlap in the parties' cross motions. Their briefs run to *more than a thousand pages and their supporting affidavits to several thousand more.* All parties have had unlimited opportunity to address the issues presented. Plaintiffs' motion is denied.

## II. Analysis

### A. Securities Claims

#### 1. Whether the Notes are Securities

The threshold issue is whether the notes constitute securities. All defendants contend that they do not.

The Securities Exchange Act of 1934 defines a security as "any note ... or ... any investment contract...." 15 U.S.C. § 78c(a)(10). The definition of a security in the Securities Act of 1933 has been held to be virtually identical, *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and I apply the same analysis in deciding whether a particular transaction is a security under either act. *See Wright v. Schock,* 571 F.Supp. 642, 646 (N.D.Cal.1983), *aff'd,* 742 F.2d 541 (9th Cir. 1984).

Plaintiffs contend that what they hold are securities, either as "notes" or as "investment contracts." In *Securities & Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profit solely from

the efforts of the promoter or a third party." The critical question is whether there has been the necessary *investment* of money. That question is answered by applying the risk capital test. *See Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1255–57 (9th Cir.1976). The Ninth Circuit applies the same test to determine whether a note is a security under the 1933 and 1934 Acts. *See, e.g., Landreth Timber Co. v. Landreth*, 731 F.2d 1348 (9th Cir.1984). The test distinguishes investment transactions, which are covered by the 1933 and 1934 Acts, from routine commercial transactions, which are not. *Id.* at 1352. Thus, even though notes are specifically included within the definition of a security, the court must look to the "economic realities" underlying the transaction. *See Kotz*, 532 F.2d at 1256.

In determining whether these notes are "risk capital" or merely "risky loans," I consider the factors identified in *Kotz*. These factors are: (1) time; (2) collateralization; (3) the form of the obligation; (4) the circumstances of issuance; (5) the relationship between the amount borrowed and the size of the borrower's business; and (6) the contemplated use of the proceeds. *Id.* at 1257–58. No one of these factors compels a decision that the notes are or are not securities. *See id.* at 1258. What matters is the combined effect of the factors. *Amfac Mortgage Corp. v. Arizona Mall of Tempe*, 583 F.2d 426, 432 (9th Cir.1978). The above list of factors is not exhaustive, and others may be appropriate depending on the particular circumstances of the case. *See Kotz*, 532 F.2d at 1258.

*Time.*

■ A demand or short-term note is seldom a security unless payment is "dependent upon the success of a risky enterprise, or the parties contemplate indefinite extension of the note or perhaps conversion to stock." *Id.* at 1257–58. Plaintiffs' notes were technically redeemable in thirty days, but were in fact subject to immediate withdrawal and were apparently used by some plaintiffs as a savings deposit. Thus, plaintiffs were not "at risk" for a long period of time. It is not clear from the record, however, whether the parties contemplated

that individual noteholders would continue to repurchase new notes, thus effecting an indefinite extension of the notes. For example, a number of the plaintiffs apparently had Tradex automatically transfer its payment for their freight bills to their note accounts. *Cf. United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1359 (9th Cir.1977) ("[a]lthough the loans were renewed several times, there appears to have been no expectation of indefinite extensions or continued roll-overs").

*Collateralization.*

■ As noted in *Kotz*, the unsecured lender is more dependent upon the managerial skills of the borrower than is the secured lender. Here, the notes were secured by Tradex's receivables, but were subordinated to SeaFirst's rights under the loan agreement. SeaFirst's default exposes the note holder's risk. The nature of a particular instrument is to be determined, however, at the time of issuance, not at a later time. *Kotz*, 532 F.2d at 1255. At issuance, plaintiffs' secured position protected them with respect to Tradex's other creditors, but subordinated them to SeaFirst, Tradex's largest lender. Plaintiffs were more vulnerable than a normal secured creditor.

*The form of the obligation.*

■ The name given to the instrument by the parties is not controlling, *Willamette Savings & Loan v. Blake & Neal Finance Co.*, 577 F.Supp. 1415, 1421 (D.Or. 1984), but must be considered. *Kotz*, 532 F.2d at 1258. Beginning with Tradex's reorganization, it treated the notes as securities and those associated with Tradex referred to them as securities. Tradex's SEC registration statement identified the notes as securities. The notes themselves provided that note deposits were "loans."

*The circumstances of issuance.*

In *Kotz*, the court stated that "[w]hether the obligations were issued to a single party or to a large class of investors sheds light on the nature of the financing." 532

F.2d at 1258. Tradex registered $30 million of notes with the SEC, advertised the notes by means of prospectuses, mail, and newspaper advertisements and sold them to more than 180 persons. The registration provided for sale of the notes to persons having "some nexus to the transportation industry" and their relatives "not more remote than four places." Thus, the notes, though not publically offered, were offered and sold to a large number of persons. *Cf. Marine Bank v. Weaver*, 455 U.S. 551 (1982) (unique agreement negotiated between two parties not a security).

*Relationship between amount borrowed and size of Tradex's business.*

The relationship between the amount borrowed and the size of Tradex's business is important because the larger the relative amount, the greater the noteholders' stake in the business and the greater their risk. *Kotz*, 532 F.2d at 1258. Tradex purchased $386,977,516 in freight bills during fiscal 1982, and had a $20,000,000 commercial line of credit from SeaFirst. The note accounts amounted to $4,135,414 on August 31, 1982. Thus, the note accounts were not particularly large in proportion to the size of Tradex's business.

*Contemplated use of the proceeds.*

In *Kotz*, the court stated:

> Proceeds constituting an essential ingredient of capital formation are generally securities. On the other hand, those used to maintain current financial position generally are not.

*Id.* at 1258.

Defendants argue that since most noteholders maintained their note accounts both before and after the registration of the note program, the note accounts were used only to document and maintain a current financial structure and position, and not for enterprise formation. One of the purposes of the note program was to assist in the expansion of Tradex's business. This does not constitute "enterprise formation," however. The note program was used to maintain a current financial position.

The time factor favors defendants, although this may be diminished by an expectation of continual roll-overs or new purchases. The contemplated use of the proceeds and the relationship between the amount borrowed to the size of the borrower's business both favor defendants.

The inadequate collateralization, form of the instrument and circumstances of issuance factors favor plaintiffs.

In this case there are several other factors I consider relevant. The first of these favors defendants and that is the nature of plaintiffs' return, which was interest at a rate designated on each note. In fact, each note apparently carried an interest rate at a designated percentage above the prime commercial lending rate. The Ninth Circuit has considered this as an additional factor indicating that a commercial loan was contemplated rather than an investment of risk capital. *See Amfac*, 583 F.2d at 434; *United California Bank*, 557 F.2d 1351, 1359 (9th Cir.1977). The importance of this factor is somewhat diminished because Tradex was free to determine the amount of interest to be paid on a particular note.

Another factor I note is that this is not a situation in which the parties negotiated the terms of the instrument. Those terms were dictated by Tradex. This case is therefore unlike *Kotz, Amfac*, and *United California Bank*. In *United California Bank*, the court stated that:

> This is not the situation where an unsophisticated investor lacked access to inside financial information. It is not even a syndicated multibank loan participation where even a sophisticated investor may lack access to crucial information.... THCF decided after completing its own credit investigation to enter into a commercial lending arrangement which it thought was relatively risk free and, in the light of hindsight, was not.

557 F.2d at 1359.

In his concurring opinion in *Kotz*, Judge Wright stated:

> In an investment situation, the issuer has superior access to and control of information material to the investment decision. Rather than relying solely on semi-anonymous and secondhand market in-

formation, as do most investors, the commercial bank deals 'face-to-face' with the promissor. The bank has a superior bargaining position and can compel wide-ranging disclosures and verification of issues material to its decision on the loan application. The bank here obtained a covenant to permit it to inspect Artko's property and records 'at such times as [the bank] may reasonably request.' Far from purchasing an instrument whose terms were fixed prior to the time of its offering, the bank negotiated the terms of the note in question.... *Kotz,* 532 F.2d at 1262 (Wright, concurring).

Similarly, in *Amfac,* the plaintiff was a sophisticated commercial lender that entered into a one-on-one deal with its borrower.

Plaintiffs here are not commercial lenders, and did not have the access to information the plaintiffs did in *Kotz, Amfac* and *United California Bank.* In fact, in 1982 Tradex applied to a number of commercial lenders in an attempt to supplement or replace the SeaFirst line of credit but, after investigation, each of those lenders declined to lend to Tradex. Also, as stated, the parties did not negotiate the terms of the notes, which were set by Tradex.

■■■ Whether a particular instrument is a security is ultimately a question of law, but where there are disputed facts, the issue may be one for the jury. *See Kotz,* 532 F.2d at 1255. I conclude that there are sufficient questions of fact to preclude ruling on this issue as a matter of law at this time.

Defendants also contend that the notes are "commercial paper" and thus exempt from certain provisions of the 1933 Act and specifically excluded from the definition of a security in the 1934 Act. *See* 15 U.S.C. §§ 77c(a)(3) and 78c(a)(10) (both of which cover "any note ... which has a maturity at the time of issuance of not exceeding nine months....."). Although the language of the statutes does not discriminate among short term notes, the courts have done so. Thus, the issue remains whether the instrument is in fact an investment.

*See Baurer v. Planning Group, Inc.,* 669 F.2d 770, 775 (D.C.Cir.1981); *Sanders v. John Nuveen & Co., Inc.,* 463 F.2d 1075 (7th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). Defendants are not entitled to summary judgment on any of plaintiffs' claims on the grounds that the notes are not securities, or are exempted from coverage by certain of the securities statutes.

Finally, I reach the same result with respect to plaintiffs' claims under the state statutes. Decisions construing the federal securities laws are entitled to deference in applying Oregon law. *See, e.g., Karsun v. Kelly,* 258 Or. 155, 161, 482 P.2d 533 (1971). Moreover, the Oregon courts have approved use of a form of the risk-capital test. *See Pratt v. Kross,* 276 Or. 483, 555 P.2d 765 (1976); *Black v. Corporation Division,* 54 Or.App. 432, 634 P.2d 1383 (1981).

2. *Whether Plaintiffs are "Purchasers" of Securities*

A second threshold question is presented by defendants' contention that many plaintiffs are not "purchasers" within the meaning of the federal securities laws. Sections 11, 12 and 17 of the 1933 Act make relief available only to those who "purchase" a security. *See, e.g., Simmons v. Wolfson,* 428 F.2d 455 (6th Cir.1970), *cert. denied,* 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971). Similarly, relief is available under section 10(b) of the 1934 Act only to those who are defrauded in connection with the "purchase" or "sale" of a security. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Defendants acknowledge that those plaintiffs who obtained their notes for the first time after June 1, 1982, the date of the second prospectus, are purchasers under the relevant statutes. Defendants assert, however, that the remaining transactions do not constitute "purchases." Those transactions are: (1) the exchange of the old, unregistered Tradex notes for new notes, pursuant to the April 29, 1982 pro-

spectus; (2) deposits of freight bill payments made automatically by Tradex into members' note accounts; and (3) monthly interest accruing on plaintiffs' note accounts.

■ In general, a "purchase" has occurred where the plaintiff has taken action representing a new decision to invest. *See Freschi v. Grand Coal Venture*, 551 F.Supp. 1220 (S.D.N.Y.1982). There must be a significant change in the nature of the investment or in the investment risks. *Rathborne v. Rathborne*, 683 F.2d 914, 920 (5th Cir.1982); *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977), *cert. denied sub nom., Harry Goodkin & Co. v. Abrahamson*, 436 U.S. 913, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978). *See also Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1181 (S.D.N.Y.1974) (creation of new rights or obligations may give rise to purchase or sale).

*Exchanges pursuant to the March 29, 1982 prospectus*

Defendants argue that those plaintiffs who exchanged their old notes for new ones had made their decision to obtain Tradex notes at a prior time, and that there was no change in the nature of their investment significant enough to constitute a new investment.

■ Exchanges made pursuant to a "major corporate restructuring" are "purchases." *In re Penn Central Securities Litigation*, 494 F.2d 528 (3d Cir.1974). In addition, an exchange is a "purchase" where it places an investor's money at additional risk. *Ingenito v. Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y.1977). Here, however, there is no indication that the structure of the new note arrangement placed plaintiffs' money at additional risk, notwithstanding later developments.

■ Pursuant to the reorganization, though, Tradex became a for-profit corporation with broader corporate powers. This change was a substantial one. *Cf. Abrahamson*, 568 F.2d 862 (modification of partnership agreement expanding purposes of partnership and its authority to invest in

other businesses not a purchase); *In re Penn Central*, 494 F.2d 528 (reorganization not substantial enough to give rise to purchases of securities).

Plaintiffs contend that the new notes were quite different from the old ones, and point out that the March 29, 1982 prospectus stated that they "differ[ed] substantially" from the old ones. Nevertheless, the only differences appear to be relatively minor. The interest rate paid noteholders was now subject to determination "from time to time" by the Tradex board of directors; in practice, however, it was tied to the rate Tradex paid on its SeaFirst loan, as it had been under the old note program. Formerly, the notes had been paid on the last day of the month in which they were issued. The new notes were payable on demand unless Tradex insisted that payment be deferred for 30 days from the date of demand. Finally, the new notes, unlike the old, were collateralized, albeit subject to the SeaFirst loan. In this respect, the new notes may have been less at risk than the old.

Plaintiffs also point out that exchange of the notes was not automatic. Rather, Tradex required the holders to enter into an "Exchange Agreement" in order to obtain the new notes. Noteholders who did not enter into such an agreement received cash for their notes, rather than new notes. This suggests the sort of affirmative action—as opposed to inaction or the "mere retention" of securities—that the securities laws require. *See Marsh v. Armada Corp.*, 533 F.2d 978, 980, (6th Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977); *In re Equity Funding Corp. Securities Litigation*, 416 F.Supp. 161, 191 (C.D.Cal.1976).

This is a close question. The reorganized Tradex was a substantially different corporate entity, and plaintiffs had to take affirmative steps to obtain notes in that new entity.[5] If the notes are securities, plaintiffs who obtained new notes in ex-

---

**5.** The change in the provisions regarding interest and the collateralization of the new notes also gave new rights to the parties. *See Ingenito,* 376 F.Supp. at 1181.

change for old are "purchasers" under the securities laws.[6]

*Automatic deposits*

 Many plaintiffs who were Tradex members used their note accounts as depositories for funds. Tradex automatically transferred the sums it paid them for the purchase of their freight bills into their note accounts. Defendants argue that no "new investment decision" was made in connection with these transfers. Plaintiffs argue that after Tradex reorganized it had to obtain their authorization to make transfers, and that the carriers' authorization of such transfers constituted a "purchase" of notes. Even if Tradex had to obtain such authorization, however, that does not make all subsequent transfers "purchases." Following the initial authorization, all transfers were automatic, and did not involve a "new investment decision." Any such transfers were not "purchases" of securities.

*Monthly interest payments*

Under the terms of the trust indenture covering the notes, accumulated interest was added to the principal amount of the note each month unless the noteholder chose to receive payment of earned interest instead. Defendants argue that this failure to withdraw accrued interest payments from their accounts does not constitute a "new investment decision." Plaintiffs argue that they were effectively waiving a right to immediate payment and "reinvesting" the amount of accrued interest. This does not constitute a "new investment decision," however. The addition of accrued interest to plaintiffs' note accounts did not significantly change the nature of plaintiffs' investments. The monthly interest payments were not "purchases."

6. Defendants point out that section 3 of the 1933 Act exempts "any security exchanged by the issuer with its existing security holders exclusively where no commission is paid or given directly or indirectly for soliciting such exchange." 15 U.S.C. § 77c(a)(9). This provision, which only applies to claims under sections 11 and 12(1) of the 1933 Act, is not applicable here

### 3. *Section 11 of the 1933 Act*

Section 11 of the Securities Act of 1933 imposes liability on certain persons involved in the filing of a registration statement, if any part of it contains an untrue statement of a material fact or omits a material fact necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a). Persons liable include: (1) those who signed the registration statement; (2) those who were directors of the issuer at the time of the filing of the registration statement; (3) those who, with their consent, are named in the registration statement as being or about to become a director; (4) every accountant, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement. 15 U.S.C. §§ 77k(a)(1)–(4).

 Subject to enumerated defenses, section 11 imposes an almost absolute liability for material misstatements or omissions in a registration statement. A plaintiff need not prove reliance, causation or scienter. *In re the Gap Security Litigation*, 79 F.R.D. 283 (N.D.Cal.1978).

Plaintiffs assert that there were numerous omissions and misrepresentations in the March 29, 1982 and June 1, 1982 prospectuses.[7] Specifically plaintiffs allege that the March 29, 1982 prospectus failed to disclose:

1. the existence of the Animated agreement;

2. that the Animated agreement resulted in expanding Tradex's business into accounts unrelated to the trucking industry, and into factoring long-term contracts, all of which

because the issuer of the new notes was a different entity than the issuer of the old notes.

7. As previously noted, these prospectuses amended registration statements filed earlier. The effective dates of the registration statements, which incorporate the prospectuses, are therefore March 29, 1982 and June 1, 1982.

posed substantially greater risks to Tradex and to plaintiffs;

3. that Tradex intended through reorganization to expand into other business activities;

4. conflicts of interest involving Schwabe, Williamson and one of the Tradex directors;

5. that the Animated agreement violated Tradex's articles of incorporation;

6. that the Animated agreement violated major covenants and restrictions in the SeaFirst loan agreement;

7. that Animated had substantial financial problems before and during its factoring agreement with Tradex;

8. that Tradex had agreed to lend funds to IML against IML's accounts receivables, secured only by a security interest in IML's accounts receivables;

9. that the agreement with IML was also in violation of Tradex's articles of incorporation;

10. that the IML agreement was in violation of Tradex's loan agreement with SeaFirst;

11. that Tradex assumed substantial risks in entering a new line of factoring with Animated without adequate security;

12. that Tradex was undertaking the Animated agreement as a first time venture without adequate security;

13. that Tradex would need to increase its financing by $6 million as a result of the IML agreement;

14. that it could reasonably be foreseen that Tradex would become insolvent due to its Animated and IML commitments;

15. that Tradex's allowance for doubtful accounts was grossly understated as to IML and non-existent as to Animated;

16. that Tradex was buying delinquent long-term contracts over 24 and 36 months from Animated for their face value with minimal reserves;

17. that both the Animated and IML transactions jeopardized Tradex's ability to operate within its SeaFirst loan limit, and that Tradex was exceeding its credit line;

18. that if SeaFirst declared the loan in default, Tradex would not be able to pay principal or interest on the debentures offered to plaintiffs.

Plaintiffs allege that the March 29, 1982 prospectus contained the following material misrepresentations:

1. the prospectus falsely stated that management had yet to enter any new lines of business;

2. the prospectus represented that following reorganization, Tradex's activities would be restricted exclusively to the freight factoring business, when in fact they were not so restricted.

Plaintiffs also allege that the June 1, 1982 prospectus contained the following material misrepresentations and omissions:

1. it misrepresented the expansion of Tradex's business and did not reasonably inform plaintiffs of the nature of the IML and Animated agreements, especially as to long-term contract factoring with Animated;

2. statements made were misleading because Tradex had already entered into an agreement with Animated prior to June 1982;

3. statements made failed to disclose Animated's financial difficulties and inherent conflicts of interest and the increased risk of financing, as opposed to factoring, accounts;

4. disclosure of Tradex's increased loan limit was insufficient and materially misleading and false, when the loan limit was actually increased to accommodate the magnitude of the Animated arrangement, and that Tradex was already in default of its SeaFirst loan agreement by exceeding its credit limit.

Plaintiffs seek summary judgment on their section 11 claims against all defendants except officer Clyde Kaneshiro and director Otto Tschanz. Defendant attorneys and defendant accountants also seek summary judgment on these claims, as do Kaneshiro and Tschanz.

■ I have concluded that issues of fact preclude the granting of summary judgment in plaintiffs' favor on these claims. I have already ruled that questions of fact remain as to whether the notes are securities, and thus plaintiffs are not entitled to summary judgment on these or any of their other securities claims. There are also issues of fact regarding the existence of many of the alleged omissions and misrepresentations, as well as their materiality, which plaintiffs must establish to prevail on their section 11 claims. The Supreme Court has defined an omitted fact as material

> if there is a substantial likelihood that a reasonable shareholder would consider it important ... There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). This definition also applies to misrepresentations. *Kramas v. Security Gas & Oil, Inc.*, 672 F.2d 766, 769 (9th Cir.) *cert. denied*, 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982). *TSC* involved a different provision of the securities laws, but the standard stated there is also applicable to a section 11 claim. *Cf. Feit v. Leasco*, 332 F.Supp. 544, 569 (E.D.N.Y.1971) (looking to what average prudent investor ought to know before buying a security). I reject defendants' contention that the test focuses on a reasonable person in circumstances similar to the plaintiffs'. *See Admiralty Fund v. Hugh Johnson*, 677 F.2d 1301, 1306 (9th Cir.1982); *Cameron Meadows*, 669 F.2d at 1281.

The materiality of all of the alleged omissions and misrepresentations is vigorously contested. Materiality is ordinarily a question for the jury, *Hugh Johnson*, 677 F.2d at 1306, and plaintiffs have failed to establish materiality as a matter of law here. In addition, there are issues of fact regarding the affirmative defenses asserted by defendants, specifically plaintiffs' knowledge of any omissions or misrepresentations, *In re Gap*, 279 F.R.D. at 297; defendants' due diligence in investigating the truth and adequacy of the statements in the registration statements, *see* 15 U.S.C. § 77k(c); and causation, the lack of which may be demonstrated by a defendant to reduce his liability under section 11. *See In re Gap*, 79 F.R.D. at 297. Plaintiffs' motions for partial summary judgment are therefore denied as to their section 11 claims.

I consider each group of defendants in turn.

*Defendant Officers*

■ Kaneshiro seeks summary judgment in all four cases on the section 11 claims against him on the grounds that he did not sign the registration statements. Defendants Brown and Delzer, who are not parties to the *Ahern* action, also seek summary judgment on the section 11 claims against them.

Kaneshiro was Tradex's chief financial officer. It is undisputed that he did not sign the registration statements and was not named as a director or as one about to become a director. Plaintiffs argue that he is liable because, as chief financial officer and the person who prepared financial statements for Tradex, he had a duty under section 6 of the 1933 Act to sign any registration statement. Plaintiffs argue that he cannot escape liability by breaching his duty. Whether Kaneshiro breached a duty by not signing is irrelevant here. Plaintiffs agree that Kaneshiro is not liable other than as one who signed the registration statements. The language of section 11 is clear. Kaneshiro did not sign the registration statements and he is therefore entitled to summary judgment on the section 11 claims against him. *See McFarland v. Memorex*, 493 F.Supp. 631, 642 (N.D.Cal.1980) (nonsigning officers cannot be held liable under section 11).

Brown and Delzer have submitted no factual materials establishing that they did

not sign the registration statements, and I therefore deny their motion. I note, however, that the *Silver Eagle* plaintiffs do not allege that these defendants signed the registration statements, and if that fact is not established at trial, Brown and Delzer will be entitled to judgment on plaintiffs' section 11 claims.

### Defendant Tschanz

Plaintiffs agree that Tschanz is entitled to summary judgment on their section 11 claims. Tschanz's motion for summary judgment on these claims is granted.

### Defendant Attorneys

■ Defendant attorneys argue that any section 11 liability must arise from their actions as "experts" with respect to the registration statements. Section 11 imposes liability on:

> any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation used in connection with the registration statement.

15 U.S.C. § 77k(a)(4).

Plaintiffs assert that defendant attorneys are liable because they had extensive knowledge of Tradex's business affairs and a high degree of involvement in the note offering. This argument finds no support in the case law. As the Supreme Court stated in a recent case, "certain individuals who are involved in preparing the registration generally cannot be reached by a section 11 action. These include ... lawyers not acting as 'experts'...." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 n. 22, 103 S.Ct. 683, 690, 74 L.Ed.2d 548 (1983). Plaintiffs rely primarily on *Escott v. BarChris Construction Corporation*, 283 F.Supp. 643 (S.D.N.Y.1968), and *Feit v. Leasco*, 332 F.Supp. at 544. Those cases are clearly distinguishable because the attorney defendants in those cases were also directors and thus specifically subject to section 11.

Schwabe, Williamson was described in the December 11, 1981 registration statement and the June 1, 1982 prospectus as having passed on certain legal matters connected with the reorganization and the registration of the notes. Plaintiffs do not seek to hold defendants liable for this work. The remainder of defendants' activities do not give rise to liability under section 11. *See Tirone v. Calderone-Cunan Ranches, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 96,-480 at 93,775 (W.D.N.Y.1978) (that defendant attorneys "passed on all legal matters" relative to the registration statement and prospectus does not confer liability on them as experts).

■ Plaintiffs have also asserted that these defendants are liable under section 11 as aiders and abettors. I disagree. Section 11 very specifically limits the categories of persons who may be held liable under it, and it would defeat the purpose of the statute to apply it to persons who do not engage in conduct covered by the statute. *See McFarland v. Memorex*, 493 F.Supp. at 642. *But see Zatkin v. Primuth*, 551 F.Supp. 39 (S.D.Cal.1982). I conclude that there is no aiding and abetting liability under section 11.

Defendant attorneys' motions for summary judgment are granted as to plaintiffs' section 11 claims.

### Defendant Accountants

If defendant accountants are liable under section 11, it must be in their capacity as experts. That is, their liability is limited to that portion of the registration statements which they are named as having either prepared or certified. *See Huddleston*, 459 U.S. at 281 n. 11, 103 S.Ct. at 687 n. 11.

Touche Ross was identified as an "expert" only with respect to the audited 1981 financial statement. Defendants contend that they cannot be held liable for their failure to mention events occurring after August 31, 1982, and correctly point out that neither the IML nor the Animated transactions at issue here had been discussed as of that date.[8]

---

**8.** The Tradex board approved the Animated agreement on January 26, 1982. The board approved the IML agreement on April 12, 1982

■ Accountant defendants are correct in asserting that they are liable only for misrepresentations or omissions contained in the audited financial statement. That does not necessarily mean that subsequent events may not be considered. Subsequent events occurring up to the effective date of the registration statement are relevant to show either that the financial statement was false when made or that it *had become misleading. See BarChris*, 283 F.Supp. at 698. Defendants attempt to distinguish *BarChris* on the grounds that there the audited financial statement was false at the time of the audit. Plaintiffs make no such contention about the 1981 Tradex financial statement. In *BarChris*, though, the court treated as a separate issue what the auditor did in its post-audit S–1 review. *BarChris*, 283 F.Supp. at 698. It found that review to be inadequate.

■ Plaintiffs have raised an issue of fact about whether subsequent events made the 1981 financial statement misleading. Thus, defendants are entitled to summary judgment only if they establish the absence of any material fact as to the adequacy of the post-audit review they conducted in February and March of 1982.

Plaintiffs assert that defendants, upon reasonable investigation, would have discovered, prior to the effective date of the registration, that Tradex bought IML's delinquent accounts for face value; that there were conflicts of interest inherent in the Animated agreement; and that Tradex was having problems collecting on the Animated accounts and contracts it factored. Plaintiffs claim defendants failed to disclose the financial agreement between Tradex and IML, or IML's financial difficulties in the financial statement they certified. Plaintiffs point out that Touche Ross's own procedures required that it "determine significant changes in receivable balances of important customers." Plaintiffs assert that defendants should have checked on IML's financial condition, and that if they had done so, they would have learned how bad it was. There is testimony that defendant David Fearn, Tradex's president,

and the agreement was executed on June 14,

asked defendant Fisher, in April 1982, to look into IML's condition. Fisher does not recall being asked to do so and, in any event, he did not do so. He did learn in mid-June, after the effective date of the registration statements and prospectuses, that IML had lost $6 million in the 19 weeks ending May 15, 1982.

In *BarChris*, the court found that the auditor's written procedures, which he did not follow, set the required standard for the post-audit investigation. *BarChris*, 283 F.Supp. at 703. I find that Touche Ross's established procedures are generally adequate here. Unlike the auditor in *BarChris*, these defendants do not appear to have failed to meet their procedures. There is no indication in the record that there was any "significant change" in IML's receivable balance with Tradex, or that any of Touche Ross's procedures should have uncovered IML's condition, or that the seriousness of IML's difficulties was apparent prior to mid-June 1982. The Ninth Circuit has recently stated, however, that:

> We assume that generally accepted accounting standards do not provide protection from liability when the accountant "fails to reveal material facts which he knows or which, but for a deliberate refusal to become informed, he should have known" should be revealed.

*Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1313 n. 15 (9th Cir.1982). I therefore conclude that, because there is some evidence that Fisher was asked to investigate IML's condition and failed to do so, the scope of defendants' duty to review Tradex's financial situation may have extended beyond following Touche Ross's established procedures, insofar as IML is concerned. *See id.*

There is no evidence that defendants' established procedures should have alerted them to any other facts making the financial statement misleading, with one possible exception. The "Description of Business" section of the financial statement certified by Touche Ross stated that Tra-

1982.

dex was "a nonprofit corporation organized to purchase freight bills from its commercial carrier members and collect the amounts due on those bills." This statement was accurate at the time it was made, but inaccurate by the time of the registration statements and prospectuses. By then, the nature of Tradex's business had expanded. Tradex was no longer purchasing freight bills from only commercial carrier members, and the board had approved a proposal to enter into the IML agreement to finance, rather than factor, its freight bills. I find no cases addressing the possibly misleading nature of such a *statement*—as opposed to the financial *data*—in such a financial document. I nevertheless conclude that such a statement can give rise to section 11 liability: it is part of what Touche Ross certified. Substantial issues of fact remain regarding the materiality of these items, as well as plaintiffs' and defendants' knowledge of them. With this exception, I find that plaintiffs' assertions that developments made the audited financial statement false or misleading are unsupported by the evidence in the record.

Plaintiffs have alleged that defendant accountants are also liable under section 11 as aiders and abettors. As previously noted, I conclude that the aider and abettor theory is unavailable under section 11. Defendants are entitled to summary judgment on this aspect of plaintiffs' section 11 claims. Defendants' motion for summary judgment on the section 11 claims is otherwise denied.[9]

### 4. *Section 12 of the 1933 Act*

The *Ahern* plaintiffs assert claims against all defendants for violations of sections 12(1) and 12(2) of the 1933 Act. Plaintiffs also allege that the accountant and attorney defendants aided and abetted

violations of these statutes. The *Silver Eagle* plaintiffs assert claims under section 12(2), but not under section 12(1). All parties seek summary judgment on plaintiffs' section 12(2) claims. Defendants seek summary judgment on the section 12(1) claims.

Section 12(1), in pertinent part, imposes liability for the mailing of a security for the purpose of sale or for delivery after sale unless the security is accompanied or preceded by a valid prospectus. 15 U.S.C. § 77e(b)(2). Section 12(1) imposes liability only on one who offers or sells a security.

Section 12(2) imposes liability on any person who

offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such truth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission....

15 U.S.C. § 77*l* (2). As noted, plaintiffs assert the existence of numerous omissions and misrepresentations in the sale of the notes.

All defendants assert that they are not "sellers" of securities within the meaning of section 12.

▇▇▇ The definition of a seller is generally the same under both section 12(1) and section 12(2). *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692 (5th Cir.1971). Defendants

---

**9.** Defendant accountants also assert that they are entitled to summary judgment on the section 11 claims brought by "plaintiffs who are fronting for Curtis McCracken" and George Grill, who represents plaintiff Estate of Knox. McCracken and Grill are former Tradex directors, and defendants urge that if violations of the securities laws occurred, McCracken and Grill were *in pari delicto*. *In pari delicto* is

available as a defense here only if the facts show that the investor is equally responsible for his injury. *Berner v. Lazzaro,* 730 F.2d 1319, 1324 (9th Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 776, 83 L.Ed.2d 772 (1985). This issue presents a number of fact questions, as does the availability of the defense against any of the actual plaintiffs in this case.

argue for a strict privity requirement. The Ninth Circuit, however, adheres to a judicially expanded definition of "seller" to include "participants" in the sales transaction. *Admiralty Fund v. Jones*, 677 F.2d 1289, 1294 (9th Cir.1982). "The test is whether the injury flowed directly and proximately from the actions of the defendant. *Id.* Participant liability extends only to those persons who have played a substantial role in the process leading to the sales transaction at issue. *Deneau v. Walker*, No. C82–3132 MHP, slip op. (N.D. Cal. Sept. 30, 1983). I consider each set of defendants in turn.

### Defendant Officers

Plaintiffs rely on the following evidence in asserting that Kaneshiro was a "participant" in the note sales: (1) he provided financial data for the registration statement; (2) he conferred with the noteholders regularly; and (3) he accepted noteholders' checks for additional investments. Plaintiffs have shown no evidence that Kaneshiro solicited their investments. He accepted their checks, but was performing "routine services in the ordinary course of business" in so doing. *See Wright v. Schock*, 571 F.Supp. at 657. Kaneshiro is entitled to summary judgment on these claims.

Defendant Fearn was the registered salesperson for the Tradex notes. It appears to be undisputed that Fearn gave presentations urging people to buy the notes. I, therefore, cannot say as a matter of law that Fearn was not a "seller." His motion for summary judgment on these claims is denied.

### Defendant Directors

Plaintiffs allege that defendant directors played a substantial role in the note sales based on the following: (1) the directors' general responsibility, pursuant to bylaws, to manage Tradex's business; (2) their participation in the April 12, 1982 annual meeting at which the new note program was presented; (3) attendance at board meetings at which promotion of the note program was discussed; and (4) attendance at the December 13, 1982 annual

meeting, at which the note program was allegedly touted. Plaintiffs point out that defendant director Harmon Leonard helped distribute promotional literature.

With the exception of Leonard, there is no evidence that any of these defendants did anything other than participate generally in Tradex's business. They did not actively solicit, participate in or arrange for any sales of Tradex notes. *See Lawler v. Gilliam*, 569 F.2d 1283, 1288 (4th Cir.1978). These defendants' activities are not sufficient to make them "sellers" under section 12. *See also Deneau, supra* (routine arrangements for issuance of new shares did not make defendants "sellers"). As for Leonard, there is no evidence that he distributed promotional literature to any plaintiff, and thus he cannot be liable as a "seller." *See In re Fortune Systems Securities Litigation*, 604 F.Supp. 150 (N.D. Cal.1984) (defendant not liable where not involved in particular sales transaction at issue). Defendants' motions for summary judgment on plaintiffs' section 12 claims are therefore granted.

### Defendant Attorneys

In asserting that defendant attorneys are liable under section 12, plaintiffs rely on: (1) Simpson's status as long-time Tradex attorney together with his firm's extensive legal work conducted in connection with Tradex's reorganization and the preparation of the required SEC documents; (2) Simpson's general knowledge of Tradex's affairs, resulting from attendance at all board meetings (Simpson was Tradex's secretary and kept the minutes of these meetings); and (3) Simpson's participation in the April 12, 1982 meeting at which plaintiffs allege that he urged Tradex's members to vote for reorganization and to participate in the note program.

The mere performance of legal services in connection with a sale of securities does not give rise to liability under section 12. *See In re North American Acceptance Corporation Securities Cases*, 513 F.Supp. 608 (N.D.Ga.1981). *See also In re Diasonics Securities Litigation*, 599 F.Supp. 447 [Current] Fed.Sec.L.Rep.

(CCH) ¶ 91,815 at 90,091 (N.D.Cal.1984). A lawyer may be liable under section 12, however, if he plays an active role in the sales transaction at issue. *See Hudson v. Capital Management International, Inc.,* 565 F.Supp. 615 (N.D.Cal.1983). Here, plaintiffs have presented evidence that Simpson urged Tradex members to invest in the note program at the April 12, 1982 meeting, attended by a number of the plaintiffs. Although it is not clear which plaintiffs attended or precisely what Simpson said, I conclude that plaintiffs have raised a sufficient question of material fact to prohibit summary judgment in favor of these defendants on the section 12 issue.

Defendants also seek summary judgment on plaintiffs' claims under section 12(1) on the grounds that a valid prospectus was in effect at all relevant times. Although there is no dispute about the existence of a valid prospectus, the plaintiffs assert that some of them received their notes before they received the prospectus. These defendants are not entitled to summary judgment on the *Ahern* plaintiffs' section 12(1) claims.

■ In addition, defendant attorneys seek summary judgment on the aiding and abetting claims against them. Defendants argue that there is no liability as an aider and abettor under section 12. Some courts have reached this conclusion, *see, e.g., Hokama v. E.F. Hutton & Co., Inc.,* 566 F.Supp. 636, 642 (C.D.Cal.1983), and others have recognized such liability, but declined to expand its scope beyond that of "participant" liability. *See, e.g., In re Itel Securities Litigation,* 89 F.R.D. 104, 116 (N.D. Cal.1981). The Ninth Circuit has not decided the issue, although it has expressed doubts about the viability of such liability under section 12. *See Admiralty Fund v. Jones,* 677 F.2d 1289, 1295 n. 4 (9th Cir. 1982).

The language of section 12 is specifically focused on those who offer or sell securities while aider and abettor liability "is a theory of secondary liability intended to apply to 'fringe' parties who knowingly assist in a primary violation." *Hokama,* 566 F.Supp. at 642.

The better reasoning causes me to conclude that aider or abettor liability is not available under section 12. Defendant attorneys are entitled to summary judgment avoiding liability as aiders and abettors to any fraudulent sale of securities.

*Defendant Accountants*

■ Plaintiffs assert that defendant accountants are "sellers" under section 12 based on: (1) their work on the registration statements and prospectuses, and (2) Fisher's speech to Tradex members at the annual meeting held on April 12, 1982. Defendants' preparation of portions of the registration statements does not render them liable under section 12. *See, e.g., Hudson v. Capital Management International, Inc.,* [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,222 at 95,899 (N.D.Cal. Aug. 24, 1982). *Cf. In re Wickes Companies, Inc. Securities Litigation* [1982–83 Transfer Binder] Fed.Sec.L.Rep. ¶ 99,055 at 95,000 (CCH) (S.D.Cal. Jan. 6, 1983).

Fisher's speech, an exhibit to the motion, as emphasized by the plaintiffs, says:

Our firm gave your Management and its accounting practices a clean bill of health for 1981 ... I am very encouraged by your growth plans and in the way your Board and Management have handled the Company's business in these recessionary times. Many companies have not done as well: keep up the good work.... I am looking forward to reporting to you a 'clean bill of health' at your Annual Meeting for many years to come.

Certain plaintiffs swear the above was "a sales pitch" and that it said to them that the note program would be a good investment. Fisher's remarks, whatever else one may say about them, do not qualify as a solicitation or the sort of "substantial participation" necessary to incur liability under section 12. Defendants' motions for summary judgment are granted as to plaintiffs' section 12 claims.

Finally, I point out that in addition to the preclusive effect of my prior rulings herein on the "notes as securities" issue, there also exist issues of fact regarding material-

ity, knowledge of various parties, causation, and due diligence which prohibit a ruling in plaintiffs' favor here.

### 5. *Section 17(a) of the 1933 Act*

All defendants seek summary judgment on plaintiffs' claims under section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a). I have previously held that there is no private right of action under section 17(a). *Brabham v. Patenta*, 614 F.Supp. 568 (D.Or. 1984). For the reasons stated in my Opinion in *Brabham*, I grant defendants' motions for summary judgment on plaintiffs' claims under section 17(a).

### 6. *Section 15 of the 1933 Act*

The *Ahern* plaintiffs seek to hold Touche Ross liable as a "controlling person" with respect to Fisher, and to hold Schwabe, Williamson liable as a "controlling person" with respect to Simpson, under section 15 of the 1933 Act, 15 U.S.C. § 77o.

Section 15 provides in relevant part:

Every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under Section 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

Plaintiffs must show that the "controlled" (here, Fisher and Simpson) person is liable under section 11 or 12 of the 1933 Act before a "controlling" (Touche Ross and Schwabe, Williamson) person will be liable. *See e.g., Hokama*, 566 F.Supp. at 646.

Defendant accountants and attorneys both seek summary judgment claiming plaintiffs have not established the primary violation. I have already concluded that there is an issue of fact as to defendant accountants' liability under section 11 and as to defendant attorneys' liability under section 12, and defendants' motions are denied.

### 7. *Section 10(b) of the 1934 Act and Rule 10b–5*

Plaintiffs assert claims against all defendants based on section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5. Plaintiffs also assert aiding and abetting claims against defendant attorneys and defendant accountants.

Section 10(b) states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b)

Rule 10b–5 states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement or a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon

any person, "in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b–5.

A private right of action has been implied under section 10(b) and Rule 10b–5. Scienter is required. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Ninth Circuit, either knowing or reckless conduct will satisfy the scienter requirement. *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). The Ninth Circuit requires the application of a "flexible duty" test to determine the scope of the defendant's duty under Rule 10b–5. *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 813 (9th Cir.1982). Those factors are: (1) the relationship between the parties; (2) the parties' relative access to information; (3) the benefit the defendant derived from the relationship; (4) the defendant's awareness that the plaintiff is relying on him; and (5) the defendant's role in initiating the securities transaction at issue. *White v. Abrams*, 495 F.2d 724, 735–36 (9th Cir. 1974). Application of this test establishes where the parties lie between the two extremes of fiduciaries, "whose affirmative duty is unparalleled, [and] complete strangers, who need only refrain from intentional misrepresentations." *Stephenson*, 652 F.2d at 813 (citation omitted).

My ruling on the "notes as securities" issue precludes granting summary judgment for plaintiffs here, and I also point out that there are questions of fact regarding materiality, scienter, causation and reliance. It is unnecessary to list all the disputed facts, as such issues are seldom determined as a matter of law. *See, e.g., Admiralty Fund v. Jones*, 677 F.2d at 1295 (scienter); *Schlanger v. Four-Phase Systems, Inc.*, 582 F.Supp. 128, 134 (S.D.N.Y.1984) (materiality).

It is necessary to briefly address the reliance issue, since the parties disagree about its effect on the case. Plaintiffs say that because they are alleging mostly *omissions*, rather than *misrepresentations*, they need not prove reliance. Defendants disagree contending that

where there is a mixture of omissions and misrepresentations, the burden of proving reliance remains on the plaintiffs.

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), the Supreme Court stated:

Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

The Ninth Circuit endorsed this approach in a case involving both misrepresentations and omissions. *See Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 477 (9th Cir.1976). If plaintiffs' evidence at trial is consistent with their assertions, then this case is an "omissions" case, and plaintiffs need not prove reliance. *See Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. at 1472. Defendants may rebut the presumption of reliance by coming forward with affirmative proof of nonreliance. *See, e.g., Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273, 1293 (9th Cir.1979). Based on the evidence submitted by the parties in support of their cross motions for summary judgment, issues of fact are presented with respect to plaintiffs' reliance.

Other than their contentions that plaintiffs' notes are not securities, neither defendant officers nor directors seek summary judgment on plaintiffs' claims under section 10(b) and Rule 10b–5. Defendant attorneys and defendant accountants do seek such summary judgment at least in part.

*Defendant Attorneys*

Defendant attorneys contend they are entitled to summary judgment on these claims because, as a matter of law, they owed no duty to the plaintiffs to disclose the alleged material misrepresentations and omissions.

A triable issue of fact may exist as to a defendant's duty to the plaintiff even in the absence of one or more of the factors previ-

ously listed. *See, e.g., Spectrum Financial Companies v. Marconsult, Inc.,* 608 F.2d 377 (9th Cir.1979), *cert. denied sub nom. Harris, Kerr, Forster and Company v. Spectrum Financial Companies,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). Because of the excessive length of this Opinion, I forego a detailed analysis of the factors. There are facts in the record showing the existence of a relationship between the parties; defendants' superior access to information; possible benefit to defendants from the relationship with plaintiffs; *see Anderson v. San Francisco Securities, Inc.* [1982 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,689 at 93,437 (N.D. Cal. May 13, 1982); reason to be aware of plaintiffs' reliance; and defendants' involvement in the initiation of the note transactions. I cannot rule as a matter of law that these defendants owed plaintiffs no duty. *See Spectrum,* 608 F.2d at 382.

Plaintiffs' section 10(b) and Rule 10b-5 claims are based in part on their assertions that defendants had a duty to update the prospectuses based on material changes in circumstances. Defendant attorneys acknowledge that such a duty may arise when a defendant has knowledge of the new material information. *See, e.g., Securities & Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1095 (2d Cir.1972) (defendants liable for failing to update prospectus based on material changes about which they knew, or should have known). The materiality of any post-effective developments, and defendants' knowledge of them (or recklessness in not knowing), present issues of fact.

■ Finally, defendants argue that they cannot be found liable as aiders and abettors under section 10(b) and Rule 10b-5. The Ninth Circuit has held that such liability exists. *Harmsen v. Smith,* 693 F.2d 932, 944 (9th Cir.1982), *cert. denied sub nom. Shannon v. Harmsen,* — U.S. ——, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). The elements of a cause of action for aiding and abetting under section 10(b) and Rule 10b-5 are:

(1) the existence of an independent primary wrong;

(2) actual knowledge by the alleged aider and abettor of the wrong and of his or her role in furthering it; and

(3) substantial assistance in the wrong. *Id.* at 943 (citations omitted). Defendants urge that they owed no duty to plaintiffs, and that absent such a duty they may be found liable only if their conduct amounted to intentional wrongdoing. *See IIT, an International Investment Trust v. Cornfeld,* 619 F.2d 909, 923 (2d Cir.1980). Defendants contend that they have established the absence of any such conduct as a matter of law. As previously noted, however, I find that the issue of defendants' scienter is not suitable for summary judgment on the facts before me.

Defendant attorneys' motion for summary judgment on plaintiffs' section 10(b) and Rule 10b-5 claims is denied.

*Defendant Accountants*

■ Defendant accountants move for summary judgment on the 10(b) claims to the extent they are based on a duty to disclose deficiencies arising after the effective dates of the prospectuses. They contend that accountants have no such "duty to update." These defendants also seek summary judgment on plaintiffs' aiding and abetting claims.

It is not clear whether the flexible duty test should be applied here to determine a duty to update. I find no cases in which the Ninth Circuit has addressed the duty to update issue. In *Hugh Johnson,* 677 F.2d 1301, the Ninth Circuit did analyze an accounting firm's liability under section 10(b) without reference to the *White v. Abrams* factors. I conclude that the issue is best analyzed by looking to those cases dealing directly with accountant liability under the securities laws, rather than by trying to adapt the flexible duty test to the situation now before the court.

■ In arguing that such a duty exists, plaintiffs rely on a number of cases in which defendants were not accountants, such as *Manor Nursing Centers,* 458 F.2d 1082. Those cases are not particularly helpful in determining the proper duty of

an independent accountant.[10] The courts addressing the issue have limited this duty to insuring that a certified statement remains accurate as of the date of its issuance. *Ingenito*, 441 F.Supp. at 549. As noted in earlier discussions, however, an accountant has an obligation to conduct a reasonable post-audit review up to the effective date of the registration in order "to maintain the integrity of the portrayal." *Id.* (citing *BarChris*, 283 F.Supp. at 697–703). I agree that defendants' certification of Tradex's 1981 financial statement gives rise to only the limited duty to update described in *Ingenito* and *BarChris. See also Hirsch v. duPont*, 553 F.2d 750 (2d Cir.1977); *In re North American Acceptance Corporation*, 513 F.Supp. at 636. I further conclude that the record contains inadequate support for plaintiffs' claim that these defendants were so involved in the preparation of the prospectuses as to assume the additional duties.

Defendants also contend that aider and abettor liability is unavailable under section 10(b). As discussed previously, the law in the Ninth Circuit is otherwise. *See Harmsen*, 693 F.2d at 944.

Defendant accountants' motions for summary judgment on plaintiffs' claims under section 10(b) and Rule 10b–5 are granted to the extent those claims are based on a duty to update more expansive than outlined above, but are otherwise denied.

### 8. *Section 20 of the 1934 Act*

The *Ahern* plaintiffs seek to hold Touche Ross liable as a "controlling person" with respect to Fisher, and to hold Schwabe, Williamson liable as a "controlling person" with respect to Simpson, pursuant to section 20 of the 1934 Act, 15 U.S.C. § 78t. Section 20 is the parallel statute to section 15 of the 1933 Act. Defendants' summary judgment motions are based on their contentions that plaintiffs have failed to establish primary liability. I have concluded that there are issues of fact and these defendants are not entitled to summary judgment on plaintiffs' section 20 claims.

### 9. *O.R.S. 59.115*

All parties seek summary judgment on plaintiffs' claims under O.R.S. 59.-115, which provides in relevant part that:

(1) Any person who:

. . . .

· (b) Offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission,

is liable ... to the person buying the security from him.

O.R.S. 59.115(1).

The parties rely on the arguments they assert in connection with plaintiffs' claims under section 12 of the 1933 Act. Issues of fact exist and plaintiffs' motions for summary judgment on their claims under O.R.S. 59.115 are denied. I consider defendants' motions individually.

### *Defendant Officers*

Unlike section 12 of the 1933 Act, O.R.S. 59.115 applies to:

[e]very person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, *officer*, or director of such seller ... unless the seller sustains the burden of proof that he did not know, not have known, of the existence of any facts on which liability is based.

O.R.S. 59.115(3) (emphasis supplied).

Thus, defendant officers need not themselves be sellers of securities to be covered by the statute. Their motions for summary judgment on these claims are denied.

### *Defendant Directors*

O.R.S. 59.115 also specifically applies to directors. *See* O.R.S. 59.115(3). The *ex-*

---

**10.** Plaintiffs contend that defendants lost their independence with respect to Tradex, but there

is insufficient evidence to support this contention.

*tent* of the directors' actual involvement with Tradex's affairs is irrelevant. *See Foelker v. Kwake,* 279 Or. 379, 386–87, 568 P.2d 1369 (1977) (defendant officer liable despite lack of personal participation in seller's business activities). Defendant directors' motions for summary judgment on these claims are denied.

### Defendant Attorneys

Defendant Simpson was Tradex's secretary. As an officer he is subject to O.R.S. 59.115. The statute extends to "every person who participates or materially aids in the purchase;" O.R.S. 59.115(3). This is subject to the defense that he did not know, and could not reasonably have known, of the existence of the facts on which liability is based. *Id.* In interpreting the "participates or materially aids" language, the Oregon courts have required more than the mere preparation and execution of documents. *Fakrdai v. Mason,* 72 Or.App. 681, 696 P.2d 1164 (1985). *See also Adams v. American Western Securities, Inc.,* 265 Or. 514, 528, 510 P.2d 838 (1973).

In *Adams,* the Oregon Supreme Court held that:

> when an attorney prepares, attends to the execution of, and personally delivers and files documents required for the registration of a security with the knowledge that solicitation and sales of such a security have already been made, such conduct goes beyond what plaintiff describes as the "preparation of documents and other services normally performed by a lawyer for a client" so as to constitute "participa[tion]" or "materially aid[ing]" in the sale of such a security.

265 Or. at 529, 510 P.2d 838. *Adams* is persuasive here. It stands for the proposition that certain routine professional services, coupled with *knowledge* of violations of the Oregon securities laws by the seller, may give rise to liability. Viewing the facts (which I have earlier discussed in the context of plaintiffs' section 12 claims) in the light most favorable to plaintiffs, I find issues of material fact. Defendant attorneys' motions for summary judgment on these claims are denied.

### Defendant Accountants

Plaintiffs have presented facts which if true would establish the performance of a number of services by defendant accountants in connection with the registration and sale of the notes. Plaintiffs have alleged that these defendants knew that plaintiffs were being defrauded. Assuming, as I must, that plaintiffs' assertions are true, and that the various other requirements of the statute are met, I cannot say that defendants have established lack of scienter as a matter of law. O.R.S. 59.115 is to be "liberally construed to afford the greatest possible protection to the public." *Adams,* 265 Or. at 524, 510 P.2d 838 (citations omitted). Defendant accountants' motions for summary judgment on these claims are denied.

### 10. *O.R.S. 59.135*

The *Ahern* plaintiffs assert claims against all defendants pursuant to O.R.S. 59.135, which is based on section 10(b). Defendants move for summary judgment on these claims for the same reasons given in support of their motions for summary judgment on plaintiffs' § 10(b) claims. With deference to federal law in this area, *see Karsun,* 258 Or. at 161, 482 P.2d 533, I deny defendants' motions, which is consistent with my conclusions with respect to plaintiffs' claims under section 10(b) and Rule 10b–5.

### 11. *RICO*

The *Ahern* plaintiffs allege that all defendants violated RICO, which provides in relevant part that:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

Section 1962 prohibits any person from: (1) using the income or proceeds derived from a "pattern of racketeering activity"

or through collection of an unlawful debt to acquire an interest in or establish an "enterprise" engaged in or affecting interstate commerce, *id.* § 1962(a);

(2) acquiring an interest in or control of an "enterprise" engaged in or affecting interstate commerce through a "pattern of racketeering activity" or collection of an unlawful debt, *id.* § 1962(b);

(3) operating an "enterprise" engaged in or affecting interstate commerce through a "pattern of racketeering activity" or collection of an unlawful debt, *id.* § 1962(c);

(4) conspiring to commit any of the above activities, *id.* § 1962(d).

Section 1961(1) defines "racketeering activity" to include designated state law felonies ranging from murder to extortion, a variety of federal criminal offenses, and bankruptcy and securities fraud. A "pattern" requires at least two acts of racketeering activity within ten years of each other, one of which must have occurred after the effective date of the statute, October 15, 1970. *Id.* § 1961(5). An "enterprise" consists of any individual, partnership, corporation, other legal entity, or group of individuals associated in fact. *Id.* § 1961(4).

All defendants seek summary judgment on plaintiffs' RICO claims on the following grounds: (1) they have not been convicted of predicate criminal offenses; (2) they have neither received income from a pattern of racketeering, nor have they used such income to acquire an interest in an "enterprise;" (3) plaintiffs were not damaged by a racketeering enterprise injury; (4) RICO does not apply to "garden-variety" securities violations; (5) plaintiffs have shown no nexus between organized crime and the activities they allege that defendants engaged in; and (6) there is no evidence of any conspiracy. Defendant accountants also assert that Touche Ross was not "substantially connected" to Tradex for purposes of section 1962(c).

I consider each of these arguments.

*Conviction of predicate criminal offenses*

■ I reject this contention. There is nothing in RICO's language suggesting such a limitation. *See Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1287 (7th Cir.1983); *USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94 (6th Cir.1982); *but see Sedima, S.P.R.L. v. Imrex Co., Inc.,* 741 F.2d 482 (2d Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917.

*Receipt of income/use to acquire interest in "enterprise"*

■ To prove a violation of section 1962(a), plaintiffs must prove that defendants used income derived from a pattern of racketeering activity to acquire an interest in, establish or operate an enterprise. *Willamette Savings & Loan v. Blake & Neal Finance Co.,* 577 F.Supp. 1415, 1426–27 (D.Or.1984). With the exception of directors Castagno, Leonard and Tschanz, there is no evidence that any defendants met this requirement. There is evidence that these defendants received income through a pattern of racketeering activity and that they used that money to buy Tradex notes. I therefore deny their motion for summary judgment as to this element of plaintiffs' RICO claim, but grant the remaining defendants' motion on this issue.

*Existence of a racketeering enterprise injury*

■ To sustain a claim under RICO, plaintiffs must prove a "racketeering enterprise injury." *Id.* at 1430. Thus, plaintiffs "must demonstrate more than simply an injury resulting from the predicate offenses: there must be an injury 'by reason of a violation of section 1962.'" *In re Federal Bank & Trust Company Ltd. Securities Litigation,* [1984 Tr. Binder] Fed. Sec.L.Rep. (CCH) 91,565 at 98,879 (D.Or. June 4, 1984) (citation omitted). In *Federal Bank,* I held that "in certain instances there may be a racketeering enterprise injury even though the form of the damage

may be no different than that suffered merely from the predicate acts." *Id.*

In *Federal Bank,* the enterprise itself was essentially a sham. That is not true of Tradex, the alleged enterprise here. Plaintiffs have alleged, however—and submitted sufficient evidence to raise an issue of fact on this point—that from June 1982 to January 1983, Tradex remained under its loan limit with SeaFirst only because of the operation of a check kite. Plaintiffs assert that this activity enabled Tradex to continue its operations, and to continue advancing funds to Animated and IML, among others, thus exacerbating Tradex's deteriorating condition while at the same time hiding that condition from its noteholders.

In *Federal Bank,* I compared the plaintiffs' injury to that allegedly suffered by the plaintiffs in *Schacht v. Brown,* 711 F.2d 1343 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983). In *Schacht,* the plaintiffs alleged that the fraudulent operation of a parent corporation allowed it to prolong the life of a subsidiary beyond insolvency and thus to increase its financial difficulties. *Id.* at 1359. The court concluded that such allegations were sufficient to state a RICO claim. *Schacht* is even more analogous here than it was in *Federal Bank.* I conclude that plaintiffs have established that whether they suffered a racketeering enterprise injury presents an issue of fact.

*Application of RICO to "garden-variety" securities violations*

■ The sanctions for a violation of RICO are severe. That does not warrant arbitrary restrictions on its broad reach. *See, e.g., Schacht v. Brown,* 711 F.2d at 1353.

*Nexus with organized crime*

■ Plaintiffs need not show a nexus with organized crime in order to sustain their RICO claims. *Willamette Savings &*

*Loan v. Blake & Neal Finance,* 577 F.Supp. at 1426.

*Conspiracy claims*

■ Plaintiffs allege that defendants conspired to violate the statute, in violation of 18 U.S.C. § 1962(d). Defendants contend that plaintiffs' conspiracy allegations are conclusory and insufficient to create an issue of fact.

To be convicted under RICO's criminal conspiracy provisions:

> an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.

*United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied sub nom. Hawkins v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). This requirement is also imposed in a civil RICO case in which a conspiracy is alleged. *See Bache Halsey Stuart Shields v. Tracy Collins Bank,* 558 F.Supp. 1042 (C.D.Utah 1983).

■ The allegations in plaintiffs' complaint are conclusory, but they have presented sufficient evidence to create an issue of fact regarding the commission of the predicate offenses, and there is evidence from which it could be inferred that defendants agreed to "participate" in Tradex's affairs through the commission of two or more predicate crimes. I conclude that summary judgment must be denied on this issue.

*Liability under 18 U.S.C. § 1962(c)*

In considering a claim for a violation of 18 U.S.C. § 1962(c),[11] I have previously required that the plaintiff prove a defendant's "substantial connection" with the enterprise. *Federal Bank, supra,* at 98,879. Control over the conduct of the enterprise's affairs is not required, however. *Id.*

---

11. 18 U.S.C. § 1962(c) provides that:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or partic-

ipate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

■ Defendant accountants contend that their involvement with Tradex was too attenuated to support liability for a violation of section 1962(c). Plaintiffs have come forward with evidence, however, which suggests defendant accountants' extensive participation in Tradex' affairs, beyond merely conducting annual audits. There is evidence of defendants preparation of interim financial statements for Tradex, assistance in the SEC registration and preparation of quarterly aging reports, as well as Fisher's presentation at the April 12, 1982 meeting. I conclude that plaintiffs have raised an issue of fact about whether defendant accountants were "substantially connected" with Tradex as required for liability under section 1962(c).

Thus, all defendants other than Castagno, Leonard and Tschanz are entitled to summary judgment on plaintiffs' claims that they are liable for violations of 18 U.S.C. § 1962(c). Otherwise, defendants' motions for summary judgment on plaintiffs' RICO claims are denied.

### 12. *Oregon RICO*

■ The *Ahern* plaintiffs allege that all defendants violated the Oregon RICO statute, O.R.S. 166.715–166.735. I have previously concluded that this statute should be interpreted consistently with the federal RICO statute, on which it is based. *Kunkle v. First Interstate Bank of Oregon and First Interstate Bancorp.*, Civ. No. 82–754–RE (D.Or. June 26, 1984). I therefore grant summary judgment to those defendants—other than Castagno, Leonard and Tschanz—plaintiffs assert are liable under 166.720(1), the parallel provision to 18 U.S.C. § 1962(a). Defendants' motions are otherwise denied.

### 13. *Fraud*

■ Defendant attorneys seek summary judgment on the *Ahern* plaintiffs' fraud claims against them. To make out their claims for fraud, plaintiffs must establish:

"(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth (8) his right to rely thereon; and (9) his consequent and proximate injury."

*Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078 (1976) (citations omitted). I consider it unnecessary to discuss these factors individually. They present numerous issues of fact. Defendants' motion for summary judgment on these claims is denied.

### 14. *Negligence*

The *Ahern* plaintiffs assert negligence claims against all defendants. All defendants other than defendant accountants move for summary judgment on those claims.

To prove their negligence claims, plaintiffs must establish the existence of: (1) a duty; (2) breach of that duty; (3) causation; and (4) damages. *See Brennan v. City of Eugene*, 285 Or. 401, 405, 591 P.2d 719 (1979). Negligence is a question for the jury except in the "exceptional" case. *Arp v. Kerrigan*, 287 Or. 73, 86–87, 597 P.2d 813 (1979).

#### *Defendant Officers and Directors*

■ Defendant officers and defendant directors argue that they are entitled to summary judgment on plaintiffs' negligence claims because plaintiffs are Tradex creditors, to whom they owe no duty. Defendants rely on *Devlin v. Moore*, 64 Or. 433, 130 P. 35 (1913), where the court adopted what is presently the minority rule, that directors are not liable to creditors for simple negligence in the performance of their corporate duties.

Even if Oregon courts would continue to follow this rule, it is unclear whether plaintiffs' relationship to defendants was that of mere creditors. Many plaintiffs apparently were involved with Tradex for a number of years as members and shareholders. Under these circumstances, I decline to rule as a matter of law that defendants owed plaintiffs no duty. Plaintiffs' motion for summary judgment on these claims is also denied.

*Defendant attorneys*

█ Defendant attorneys contend that plaintiffs cannot state a cause of action for negligence against them because there was no attorney-client relationship between them. The Oregon Supreme Court has held, however, that particular circumstances may nevertheless give rise to a duty to third parties. *See, e.g., McEvoy v. Helikson*, 277 Or. 781, 562 P.2d 540 (1977). In *Metzker v. Slocum*, 272 Or. 313, 316, 537 P.2d 74 (1975), the court described the relevant factors as:

> the extent to which the transaction was expected to affect the plaintiff, the foreseeability of the harm to him, the degree of uncertainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, and the prevention of future harm.

It may be that at trial the evidence will be such that I should rule as a matter of law that the general rule requiring privity in actions for legal malpractice must apply here. Considering the factors listed in *McEvoy*, however, I conclude that plaintiffs have presented evidence sufficient to create an issue of fact. Defendants' motion for summary judgment on plaintiffs' negligence claims against them is denied. Plaintiffs' motion for summary judgment on these claims is also denied.

*Defendant accountants*

Plaintiffs seek summary judgment on their negligence claims against the accountants. This is a question for the jury. Plaintiffs' motion for summary judgment on these claims is denied.

### 15. *Gross Negligence*

The *Ahern* plaintiffs assert gross negligence claims against all defendants. Plaintiffs[12] and defendant officers, directors and attorneys move for summary judgment on these claims.

█ "Gross negligence is characterized by conscious indifference to or reckless disregard of the rights of others." *Garrison v. Pacific Northwest Bell*, 45

Or.App. 523, 532, 608 P.2d 1206 (1980). This question is generally one for the jury. *Id.* Based on the record before me, I decline to rule on it as a matter of law as to any of these defendants. Plaintiffs' motions for summary judgment on these claims are, of course, denied.

### 16. *Conversion*

The *Ahern* plaintiffs assert conversion claims against all defendants, who move for summary judgment.

█ Certain plaintiffs are freight carriers whose bills Tradex factors. They maintain a security deposit with Tradex pursuant to their factoring agreement with Tradex. These security deposits were also frozen when SeaFirst declared Tradex in default of its loan agreement with SeaFirst. At that time, plaintiffs allege, Tradex executed and delivered to certain plaintiffs bank checks or wire transfers drawn on plaintiffs' note accounts. When plaintiffs presented them to their banks, the banks refused payment. When the bad checks or wire transfers were returned to Tradex on or about January 27–29, 1983, plaintiffs allege, defendants placed them in plaintiffs' security deposits rather than their note accounts, thereby putting them in a less secured position and depriving plaintiffs of interest they say they would have received. Plaintiffs contend that this amounted to conversion.

> Conversion is:
>
> an intentional exercise of dominion and control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

*Mustola v. Toddy*, 253 Or. 658, 456 P.2d 1004 (1969). When a conversion of money is alleged, a plaintiff must prove that the defendant is obligated to return specific money that the plaintiff claims. *Waggoner v. Haralampus*, 277 Or. 601, 561 P.2d 586 (1977).

**12.** Believe it or not.

Here, there is no evidence that would suggest that any of the defendants' conduct constituted an exercise of dominion and control over the money, or that there was *specific* money they received and to which plaintiffs have a right. All defendants are therefore entitled to summary judgment on plaintiffs' conversion claims.

### 17. *Money Had and Received*

The *Ahern* plaintiffs assert claims for money had and received against all defendants. Defendants move for summary judgment.

Plaintiffs' claim for money had and received are based on the same facts as their conversion claim. Plaintiffs argue that in placing the dishonored checks and wire transfers in their security deposits rather than their note accounts, defendants used the money for an unauthorized purpose.

An action for money had and received may be maintained where the defendant has money which, in equity and good conscience, he ought to pay to the plaintiff. *Burlington Northern v. Lester*, 48 Or.App. 579, 585, 617 P.2d 906 (1980).

It is uncontroverted that neither defendant accountants nor defendant attorneys ever received any money rightfully belonging to plaintiffs, and they are therefore entitled to summary judgment on plaintiffs' claims for money had and received. Similarly, plaintiffs have failed to present any evidence that defendant officers ever received any money belonging to plaintiffs.

With respect to defendant directors, plaintiffs rely on *Craven v. Wright*, 114 Or. 692, 236 P.2d 1043, 1044 (1925), where the court stated that

> Where a check has been given to a person for one purpose and it has been diverted to a purpose different from that for which it was given ... [t]he maker may bring an action in trover for the conversion of the check, or an action for money had and received.

Plaintiffs argue that by applying plaintiffs' dishonored checks to their security deposits rather than their note accounts, defendant directors diverted those checks to an improper purpose within the meaning of *Cra-*

*ven. Craven*, however, says nothing about the liability of a corporate agent handling funds on behalf of the corporation. In a more recent case, the Oregon Supreme Court has explained the cause of action for money had and received as follows:

> The obligation arises because the defendant has received money under circumstances when it should not have been paid to him or should have been paid to someone else and it would be 'unjust enrichment' for him to retain the money.

*Rosenblum v. First State Bank of Elgin*, 283 Or. 123, 581 P.2d 515, 519 n. 1 (1978). There are simply no facts demonstrating that defendant directors received or retained money under circumstances that would give rise to liability for money had and received. Their motion for summary judgment is granted with respect to this count of plaintiffs' complaint.

### 18. *Separate Trials*

The *Ahern* plaintiffs have moved for a separate trial on their claims against defendants. Their principal argument is that the *Silver Eagle* plaintiffs are associated with defendant Roy Gaussoin, whom the *Ahern* plaintiffs say is one of the primary actors among the defendants. Defendants oppose this motion. The *Silver Eagle* plaintiffs take no position on it.

Since these are separate cases, this is essentially a motion not to consolidate these cases for trial, which I have previously discussed with the parties. Consolidation may be ordered when cases involving common questions of law or fact are pending before the court. Fed.R.Civ.P. 42(a). It is permitted "as a matter of convenience and economy in administration." 9 C. Wright & Miller § 2383 (1971). It is a matter within the broad discretion of the court.

I have given full consideration to plaintiffs' arguments. I conclude that plaintiffs will not be prejudiced by having the *Silver Eagle* plaintiffs present their cases in the same trial. There are more than a hundred plaintiffs in these cases, most of them in the *Ahern* case. Their

relationships with Tradex and the defendants are extremely varied, it appears. Each plaintiff's case will require consideration on its own merits, and the *Silver Eagle* plaintiffs' involvement will not make it more difficult for the jury to make the necessary distinctions between individual plaintiffs.

It is also clear that there are numerous overlapping factual and legal questions here. The facts and issues presented by these cases are complicated, and all parties anticipate two lengthy trials if the cases are tried separately. I conclude that there will be a very significant savings of time if the cases are consolidated.[13] I therefore deny plaintiffs' motion for a separate trial, and consolidate these cases for trial pursuant to Fed.R.Civ.P. 42(a).

### Conclusion

Plaintiffs' motions for summary judgment are denied in their entirety. I also conclude that questions of fact remain on whether the notes are securities. I hold that plaintiffs are "purchasers" with respect to the note exchanges, but not with respect to the automatic transfers and interest payments.

Defendant officers' motions for partial summary judgment are: granted as to plaintiffs' section 11 claim (Kaneshiro only); granted as to plaintiffs' section 12 claims (Kaneshiro only); granted as to plaintiffs' section 17(a) claims; granted as to plaintiffs' RICO claims with respect to liability under 18 U.S.C. § 1962(a), and denied as to the remainder of plaintiffs' RICO claims; granted as to plaintiffs' Oregon RICO claims with respect to liability under O.R.S. 166.720(1), and denied as to the remainder of plaintiffs' Oregon RICO claims; as to plaintiffs' claims under the Oregon securities laws; granted as to plaintiffs' claims for conversion; denied as to plaintiffs' claims for negligence and gross negligence; and granted as to plaintiffs' claims for money had and received.

Defendant directors' motions for partial summary judgment are: granted as to plaintiffs' section 11 claims (Tschanz only); granted as to plaintiffs' section 12 claims; granted as to plaintiffs' section 17(a) claims; granted as to plaintiffs' RICO claims with respect to liability under 18 U.S.C. § 1962(a) (except for defendants Leonard, Castagno and Tschanz), and denied as to the remainder of plaintiffs' RICO claims; granted as to plaintiffs' Oregon RICO claims with respect to liability under O.R.S. 166.720(1) (except for defendants Leonard, Castagno and Tschanz) and denied as to the remainder of plaintiffs' Oregon RICO claims; denied as to plaintiffs claims under the Oregon securities laws; granted as to plaintiffs' claims for conversion; denied as to plaintiffs' claims for negligence and gross negligence; and granted as to plaintiffs' claims for money had and received.

Defendant attorneys' motions for partial summary judgment are: granted as to plaintiffs' section 11 claims; granted as to plaintiffs' section 12 claims, but only with respect to secondary liability; denied as to plaintiffs' section 15 claims; granted as to plaintiffs' section 17(a) claims; denied as to plaintiffs' section 20 claims; denied as to plaintiffs' RICO claims; denied as to plaintiffs' Oregon RICO claims; denied as to plaintiffs' claims under the Oregon securities laws; granted as to plaintiffs' conversion claims; denied as to plaintiffs' fraud claims; denied as to plaintiffs' negligence and gross negligence claims; and granted as to plaintiffs' claims for money had and received.

Defendant accountants' motions for partial summary judgment are: granted as to plaintiffs' section 11 claims, but only with respect to secondary liability; granted as to plaintiffs' section 12 claims; denied as to plaintiffs' section 15 claims; granted as to plaintiffs' section 17(a) claims; denied as to plaintiffs' section 10(b) claims; denied as to plaintiffs' section 20 claims; denied as to

---

**13.** I previously suggested trying the cases separately, but to the same jury, but the parties declined to stipulate to this procedure.

plaintiffs' RICO claims; denied as to plaintiffs' Oregon RICO claims; denied as to plaintiffs' conversion claims; and granted as to plaintiffs' claims for money had and received.

I also deny the *Ahern* plaintiffs' motions to strike and for separate trial.